PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
11/16/99
THOMAS K. KAHN
CLERK

——————————————

No. 97-5121

——————————————

D. C. Docket No. 96-CV-1082-Nesbitt

RED MENDOZA,

Plaintiff-Appellant,

versus

BORDEN, INC., d.b.a. Borden's Dairy,

Defendant-Appellee.

———————————————

Appeal from the United States District Court
for the Southern District of Florida

———————————————
**(November 16, 1999)**

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL and MARCUS, Circuit Judges.[*]

HULL, Circuit Judge:

---

[*]Judge Charles R. Wilson was appointed after this case was orally argued en banc, but is an active member of the court at the time the case is decided. He has elected not to participate in the decisional process.

This appeal requires this Court to determine whether Appellant Red Mendoza introduced sufficient evidence at trial to support her claim alleging hostile-environment sexual harassment. We conclude that she did not, and therefore we hold that the district court properly granted Appellee Borden's Rule 50(b) motion for judgment as a matter of law on Mendoza's sexual-harassment claim.[1]

## I. Procedural History

In April 1997, Mendoza filed a complaint in the United States District Court for the Southern District of Florida against Borden alleging a variety of employment claims. Mendoza asserted claims for age discrimination under the Age Discrimination in Employment Act ("ADEA"), disability discrimination under the Americans with Disabilities Act ("ADA"), retaliation under Title VII, and sexual harassment under Title VII. Mendoza also asserted state-law claims alleging intentional infliction of emotional distress and discrimination in violation of the Florida Civil Rights Act.

Following discovery, Borden moved for summary judgment on all claims. After hearing oral argument, the district court granted summary judgment to Borden

---

[1]All judges concur in the majority opinion's disposition of Mendoza's claims for age and disability discrimination, retaliation, and under state law. The opinion for the Court on her sexual harassment claim is joined in full by Chief Judge Anderson and Judges Edmondson, Cox, Dubina, Black, and Carnes. Regarding her sexual harassment claim, Judges Edmondson and Carnes also file separate concurring opinions; Judge Tjoflat files a dissenting opinion, in which Judges Birch, Barkett, and Marcus join; Judge Barkett files a dissenting opinion, in which Judge Birch joins.

2

on all of Mendoza's claims except her sexual-harassment and disability-discrimination claims.

The parties then proceeded to a jury trial. Following the conclusion of Mendoza's case in chief, the district court granted judgment as a matter of law to Borden on her remaining claims including Mendoza's hostile-environment sexual-harassment claim.

Mendoza appealed the district court's orders awarding summary judgment to Borden on her ADEA, retaliation, and state-law claims and the district court's order granting Borden judgment as a matter of law on Mendoza's sexual-harassment and ADA claims. A panel of this Court affirmed the district court's summary-judgment rulings and the entry of judgment as a matter of law on the ADA claim, but reversed the district court's ruling on Borden's motion for judgment as a matter of law on Mendoza's sexual-harassment claim. Mendoza v. Borden, Inc., 158 F.3d 1171 (11th Cir. 1998). On Borden's suggestion for rehearing en banc, this Court voted to hear the case en banc, vacated the panel's opinion, and subsequently directed the parties to brief issues related to Mendoza's sexual-harassment claim. Mendoza v. Borden, Inc., 169 F.3d 1378 (11th Cir. 1999).

We agree with the panel that the district court properly granted Borden's motions for summary judgment and judgment as a matter of law on Mendoza's claims

for age discrimination, disability discrimination, retaliation, intentional infliction of emotional distress, and discrimination in violation of the Florida Civil Rights Act. Therefore, we affirm the district court's entry of judgment in favor of Borden on Mendoza's claims for age discrimination, disability discrimination, retaliation, and Mendoza's state-law claims. However, we disagree with the panel's conclusion on Mendoza's sexual-harassment claim. For the reasons below, we conclude that the district court did not err in granting Borden's motion for judgment as a matter of law on Mendoza's sexual-harassment claim.

## II.    Factual Background

Mendoza worked in Borden's Miami facility for a total of sixteen months. In December 1993, Mendoza began work with Borden as a temporary employee in the accounting department. In April 1994, she became a permanent employee. Her employment ended in April 1995. According to Borden, Mendoza's employment ended because she was absent from work for three consecutive days without calling to explain her absence as required by Borden's written personnel policies.

During most of her tenure with Borden, Mendoza's supervisor was Daniel Page. He began working in the Miami facility in May 1994; and therefore, his employment overlapped with Mendoza's for approximately eleven months. As the controller of

the Miami facility, Page was the highest ranking Borden employee at the facility. Thus, Page exercised supervisory authority over Mendoza.

The Miami facility where Mendoza worked consisted of several discrete areas. The plant where the milk was processed constituted the majority of the facility, but the facility also included various offices, hallways, and an outdoor picnic area. Mendoza worked in the same office area with eight to twelve other accounting clerks. Page worked in a glass-enclosed office situated in one corner of that office area. From his desk, Page could observe the rest of the office area.

In sexual harassment cases, the courts must consider the alleged conduct in context and cumulatively. Therefore, we set forth all alleged harassing conduct so that we can look at the totality of the circumstances. At trial, Mendoza testified to these instances of conduct by Page. First, she testified that:

> the man was constantly watching me and following me around and looking me up and down, whether it was face to face with me or as I would get up from a lunch table or from the picnic table to walk away and to go back to the office.

Later, Mendoza further explained Page's conduct:

> He seemed to be wherever I was in the plant. He followed me not around the office, but around the hallways in the Plant. Okay? He was at a lunch table in the lunch room. He would be at a picnic table outside. And he would look me up and down, very, in a very obvious fashion. When I was face to face with him, when I would get up and walk away from these tables or areas, I would feel him watching me up and down from--okay.

5

Finally, Mendoza reiterated that Page's following and watching "was a constant thing" and that Page never said anything during the following and watching.

Mendoza also testified about two instances when Page "looked at me up and down, and stopped in my groin area and made a . . . sniffing motion." Mendoza described these two instances as follows:

> A. There was an incident where I was standing at a copy machine direct right next to his office. I was making copies. I felt somebody watching me. I looked directly to my right. <u>He was sitting at a chair in the conference room, which is approximately 20, 25 feet away from me</u>, at a chair at the end of the table. And he looked at me up and down, and stopped in my groin area and made a (indicating) sniffing motion.
>
> This also happened another time. It had to be in March, I had the flu. <u>I went into his office</u> -- <u>he was sitting at his computer</u> -- to tell him that my doctor wanted me to take time off because of this flu. And he turned around to his right, looked directly at me, up and down, and stopped again in the groin area, made a sniffing motion again, (indicating), like that.

(Emphasis supplied.) In one instance, Page was twenty to twenty-five feet away from Mendoza, and in the other, Page was sitting at his computer when Mendoza entered his office. She further testified to one other time when he walked around her desk and sniffed without looking at her groin. Mendoza admitted that Page also <u>never said anything to her</u> during what she perceived to be the sniffing nor the looking up and down.

6

Explaining her only allegation that included any physical conduct, Mendoza testified that while she was at a fax machine in a hallway, Page passed by her and "rubbed his right hip up against my left hip" while touching her shoulder and smiling. Mendoza's complete description of this follows:

> I was doing a fax. We had a small coffee machine directly outside the office to the right of our office. I was doing a fax. And this was -- the fax machine was by the doorway, and he rubbed -- he went by me and he rubbed his right hip up against my left hip. I was at an angle, rubbed against me, walked by me, touched my shoulders at the same time, simultaneously. I was startled, I looked up, and he gave me a big smile.

When asked if Page said anything at that point, Mendoza testified, "No, he didn't." Mendoza also explained that this was the only physical contact during the eleven months she worked for Page. Finally, Mendoza described an incident when she confronted Page by entering his office and saying "I came in here to work, period." According to Mendoza, Page responded by saying "Yeah, I'm getting fired up, too."[2] When asked if Page said anything else during that meeting, Mendoza testified, "No, he didn't." Mendoza also admitted this was the only time where Page said anything

---

[2]The jury trial began with opening statements at 1:13 P.M. on May 13 and concluded on May 14 by 10:15 A.M. Mendoza's entire testimony covers seventy-nine pages, but her direct and cross examination about Page's harassing conduct totals twenty-four pages. Since her testimony is fairly brief, we are able to quote her exact descriptions of Page's conduct in order to assure full consideration of Mendoza's allegations cumulatively and in context. Besides Mendoza, only one other witness testified at trial. Jenny Voltapelti, who is married to Mendoza's dentist, testified that during several dental appointments, Mendoza related to her that she was being sexually harassed at work. Voltapelti did not recall the details that Mendoza related.

to her that she perceived to be of a sexual nature. When asked if "Page ever use[d] vulgar language with you?", Mendoza replied, "No, he didn't."[3]

At the close of Mendoza's evidence, Borden moved for judgment as a matter of law on Mendoza's hostile-environment sexual-harassment claim. After hearing argument from counsel, the district court, ruling from the bench, granted Borden's motion. The court found the incidents of harassment "in the minds of a reasonable juror or to a reasonable person, are not physically threatening or humiliating, and certainly there was not a sufficient frequency and severity to suggest a hostile or abusive environment." The court further remarked that the allegations were largely devoid of any physical contact or overly offensive comments. Accordingly, the district court concluded that, assuming Mendoza's allegations were sexual in nature, Mendoza had not established a hostile or abusive work environment.

## III. Standard of Review and Standard for Granting Judgments as a Matter of Law

This Court reviews de novo a district court's denial of a motion for judgment as a matter of law. Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997), cert. denied sub nom. Combs v. Meadowcraft Co., 118 S. Ct. 685 (1998). We employ the same standard the district court applied, "review[ing] all of the evidence

---

[3]Although Page never used vulgar language with her, Mendoza did testify that other workers did. The example Mendoza gave was Ms. Diaz's being in the habit of sharing with Ms. Murphy her sexual plans with her husband.

in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party." Walker v. NationsBank of Florida, N.A., 53 F.3d 1548, 1555 (11th Cir. 1995). Although the existence of a genuine issue of material fact precludes judgment as a matter of law, "a jury question does not exist because of the presence of a 'mere scintilla of evidence'." Id. A motion for judgment as a matter of law will be denied only if "reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." Id. These standards require us to consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Combs, 106 F.3d at 1526 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). "If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted." Combs, 106 F.3d at 1526 (quoting Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)).

We recognize that claims of employment discrimination, including sexual-harassment claims, present fact-intensive issues. However, we agree with the Fifth Circuit's observation that motions for summary judgment or judgment as a matter of law are appropriate to "police the baseline for hostile environment claims." Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264 n.8 (5th Cir. 1999).

## IV. Discussion

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  It expressly prohibits refusing to hire or discharging an employee based on a prohibited factor. Id.  Likewise, Title VII also expressly provides that "[i]t shall be an unlawful employment practice for an employer . . . otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Id.

Title VII does not mention sexual harassment.  Nevertheless, the Supreme Court and this Court long have recognized that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment. " Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986) (other internal quotation marks and citations omitted)); Henson v. City of Dundee, 682 F.2d 897, 901 (11th Cir. 1982) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971) ("[T]he phrase 'terms, conditions, or privileges of employment' in (Title VII) is an expansive concept which sweeps within

10

its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.")).

To establish a hostile-environment sexual-harassment claim under Title VII based on harassment by a supervisor, an employee must show: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. Henson, 682 F.2d at 903-05.[4]

Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal "civility code." Oncale v. Sundowner Offshore Services, Inc., 118 S. Ct. 998, 1000-02 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or

---

[4]Regarding this fifth factor, the Supreme Court held recently that in claims based on a supervisor's harassment, an employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate (or successively higher) authority over the employee – subject to an affirmative defense. Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2292-93 (1998); Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 2257, 2270 (1998).

11

connotations."); Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2283 (1998) ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (internal citation omitted)); Meritor, 477 U.S. at 67 ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

Sexual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment. The paradigm of sexual harassment as federally prohibited employment discrimination occurs when an employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compliance with the employer's sexual demands. Burlington Indus., 118 S. Ct. at 2265 ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."). In such a case, traditionally described as quid pro quo harassment, the "discrimination with respect to terms or conditions of employment [is] explicit." Id. at 2264; see also Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1246 (11th Cir. 1998).

12

Absent such "explicit" discrimination, an employee must make some showing in order to connect allegations of sexual harassment to a violation of Title VII. Thus, in the cases traditionally described as hostile-environment cases, an employer's harassing actions toward an employee do not constitute employment discrimination under Title VII unless the conduct is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor, 477 U.S. at 67 (quoting Henson, 682 F.2d at 904).

Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. Harris, 510 U.S. at 21-22. The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. Id. The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim . . . subjectively perceive[s] . . . to be abusive." Id. at 21. Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundown Offshore Servs., Inc., 118 S. Ct. 998, 1003 (1998) (quoting Harris, 510 U.S. at 23).

The objective component of this analysis is somewhat fact intensive. Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris, 510 U.S. at 23). The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment. Id.; see Harris, 510 U.S. at 23; Henson, 682 F.2d at 904; Faragher v. City of Boca Raton, 118 S. Ct. at 2283 (citing Harris, 510 U.S. at 23, and explaining that "[w]e directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances'").

Other circuits have applied these factors to delineate a minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII. Many decisions throughout the circuits have rejected sexual-harassment claims based on conduct that is as serious or more serious than the conduct

14

at issue in this appeal. Shepherd v. Comptroller of Public Accounts of Texas, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that several incidents over a two-year period, including comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim); Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264-67 (5th Cir. 1999) (noting it was "dubious" whether several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual advance would be sufficient to establish a hostile environment); Quin v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) (holding that statement that plaintiff had the "sleekest ass" in office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); Adusumilli v. City of Chicago, 164 F.3d 353, 357 (7th Cir. 1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five "sexually-

15

oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under Harris because not necessarily gender-related); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); Black v. Zaring Homes, Inc., 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns"; suggesting land area be named as "Titsville" or "Twin Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"; laughing when plaintiff mentioned the name of Dr.

16

Paul Busam, apparently pronounced as "bosom"); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); Kidwai v. McDonald's Corp., No. 93-1720 (4th Cir. April 18, 1994) (holding insufficient under Harris seven incidents, including one instance in which harasser asked plaintiff whether "she was in bed with someone"); Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims – supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work – were not sufficient for actionable sexual harassment); see also DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."); Indest v. Freeman Decorating, Inc., 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved

patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

In this appeal, the conduct alleged by Mendoza falls well short of the level of either severe or pervasive conduct sufficient to alter Mendoza's terms or conditions of employment. Construing the evidence in the light most favorable to Mendoza, she presented evidence of four categories of harassing conduct: (1) one instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's "constant" following and staring at Mendoza in a "very obvious fashion."

As an initial matter, whether Page's conduct testified to by Mendoza includes the necessary sexual or other gender-related connotations to be actionable sex discrimination is questionable. See Brill v. Lante Corp., 119 F.3d 1266, 1274 (7th Cir. 1997) (rejecting the plaintiff's attempt to buttress a hostile-environment claim with evidence of unpleasant, but non-sexual, conduct); Galloway, 78 F.3d at 1167-68 (noting that the term "sick bitch" is not necessarily a sexual or gender-related term). For example, although the statement "I'm getting fired up" could under some circumstances denote sexual or romantic desire, Page's statement that he was "getting

18

fired up" occurred in the context of reacting to a complaint by Mendoza. As she described the interaction: "I went into his office angry and disgusted. . . . Mr. Page turned around and I said to him, 'I came in here to work, period' and his reply to me was 'yeah, I'm getting fired up, too.'" By Mendoza's own description, Page did not approach her but instead, she approached Page while another employee was present in his office. Mendoza also admits that Page said nothing else. Thus, the circumstances of this interaction do not objectively indicate that the statement "I'm getting fired up" had a sexual or other gender-related connotation.

As another example, although "following and staring" can betray romantic or sexual attraction, the everyday observation of fellow employees in the workplace is also a natural and unavoidable occurrence when people work together in close quarters or when a supervisor keeps an eye on employees. For example, Mendoza described Page's constant "following and staring" as "he always seemed to be wherever I was. If I was in the lunch room, he was there. If I was at a picnic table outside on a break, he was there." Nevertheless, because we conclude that the conduct established by Mendoza was not sufficiently severe or pervasive to alter Mendoza's

terms or conditions of employment, we assume, but do not decide, that this conduct is sexual in nature and thus might implicate sex discrimination.[5]

Turning to the heart of this appeal, an examination of the factors from Harris and applied in Allen demonstrates that Mendoza did not endure conduct that was so severe or pervasive that it altered the terms or conditions of her employment. Three of the four factors – physically threatening or humiliating conduct, interference with job performance, and severity – are clearly absent from the conduct established by Mendoza. The other factor – frequency of the harassing conduct – is also for the most part lacking, but to the extent Mendoza showed frequent conduct, the frequency of it does not compensate for the absence of the other factors.

First and most importantly, Mendoza did not present evidence that Page's conduct was "physically threatening or humiliating" or that the cumulative effect of this conduct "unreasonably interfered" with Mendoza's job performance. Even construing the evidence in the light most favorable to Mendoza, Page's statement "I'm getting fired up" and the sniffing sounds are hardly threatening or humiliating.

---

[5]To establish that the harm alleged was "based on her sex," Mendoza "must show that but for the fact of her sex, she would not have been the object of harassment." Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982). The purpose of Title VII is to strike at the disparate treatment of men and women. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986). Mendoza never claimed, and never produced any direct evidence, that Page treated women employees differently from male employees. Instead, Mendoza sought to establish discrimination "based on sex" circumstantially by claiming Page's conduct amounted to sexual advances towards her. Thus, we discuss whether Page's conduct was sexual in nature.

20

Compare Hall v. Gus Const. Co., 842 F.2d 1010, 1012 (8th Cir. 1988) (sexual harassment established with evidence that, inter alia, female employees were held down so that other employees could touch their breasts and legs), with Long v. Eastfield College, 88 F.3d 300, 309 (5th Cir. 1996) (holding sexually-oriented joke is the kind of non-threatening "utterance" that cannot alone support hostile-environment claim). Even more clearly, the one instance of Page brushing his hip against Mendoza's hip and Page's constant "following" of Mendoza are neither threatening or humiliating. Likewise, nothing in the record indicates that Page's conduct impaired Mendoza's job performance.

Second, none of the conduct alleged by Mendoza is severe. Even if somehow offensive, Page's statement "I'm getting fired up," the three sniffing sounds, the one instance of physical conduct, and the following/staring are much less severe than the incidents of sexual banter and inappropriate touching described, and found insufficient, by the Second Circuit in Quin and the Fourth Circuit in Hopkins, for example. Quin, 159 F.3d at 768 (holding a comment about the plaintiff's "posterior" and touching of her breasts with some papers did not create a hostile environment); Hopkins, 77 F.3d at 753-54 (holding that multiple instances of inappropriate conduct, including placing a magnifying glass over the plaintiff's crotch, did not establish sexual harassment).

Third, aside from Page's "constant" following and staring, the conduct asserted by Mendoza was not frequent. She established a single instance of slight physical contact, one arguably inappropriate statement, and three instances of Page's making a sniffing sound. These instances occurred over an eleven-month period and therefore were far too infrequent to alter the conditions under which Mendoza was required to perform her job. Cf. Sprague, 129 F.3d at 1366 (reasoning that five sexually-oriented incidents over sixteen months were sporadic).

To the extent Mendoza's testimony about "constant" following and staring established the frequency factor, this evidence does not create a jury issue on Mendoza's sexual-harassment claim. There is no allegation of any staring or following Mendoza outside the workplace or of any calling Mendoza after work. Regarding the workplace, Mendoza admits that Page never followed her in the office part of the plant where Mendoza worked, and thus necessarily spent most of her time.[6] Indeed, Mendoza did not describe the following as walking close behind her in an intimidating or threatening fashion, but instead simply as Page's showing up when Mendoza happened to be in the hallways, in the lunch room, or at the picnic table outside. In her testimony at trial, Mendoza never described Page's following or

---

[6]Mendoza says she never went into the processing plant which constituted the majority of the Miami facility.

22

staring as "stalking" or "leering" or "intimidating" or "threatening." Similarly, none of Mendoza's briefs regarding her Title VII claim before the panel or en banc characterizes Pages's following or staring as "stalking," "leering," "intimidating," or "threatening."[7]

Given normal office interaction among employees, the following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable, even with evidence that the following and staring were "constant" and thus "frequent" under the Harris factors. Also, considering the following and staring described by Mendoza with and in the context of the sniffs, one verbal statement, and one slight touching as Page walked by the fax, we find Mendoza's claim still falls far short of actionable hostile environment sexual harassment.[8]

---

[7]The initial panel opinion does not either. Mendoza v. Borden, Inc., 158 F.3d 1171 (11th Cir. 1998), vacated, 169 F.3d 1378 (11th Cir. 1999). The first and only time "stalking" in connection with Mendoza's Title VII claim appears in this case are the dissents filed at the en banc stage.

[8]Judge Tjoflat's dissent cites seven decisions involving following and/or staring. However, each case involves additional conduct that is far more egregious than what Mendoza alleges, and those cases in the dissent, if anything, highlight the insufficiency of Mendoza's evidence. For example, the dissent notes that Cross v. Alabama Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1495-97 (11th Cir. 1995), involved "glaring looks, piercing looks." However, that case also had seven female plaintiffs' testifying that the harasser treated his women employees differently than men. According to the plaintiffs, the harasser threw objects at the women daily, yelled, screamed and belittled them, and engaged in name calling, derogatory remarks, verbal abuse, finger pointing, and offensive touching with women, but never engaged in this conduct with his male employees. The harasser's manner of communicating with female employees was described as "extremely hostile, very angry, very aggressive" and "demeaning" but as "very professional" with

male employees. The harasser's derogatory comments to women included "women belonged barefoot and pregnant," "fat butt," "a butt head," "a cow," "rather dumb," "stupid," and "just a woman." The harasser told "sexual and dirty jokes," and said, "I guess women are taking over things" and made comments that mistakes would not happen if males were in the position of decision making. The harasser had an affair with a female employee who testified that he described women as less intelligent than men and said they "cause a lot of trouble, and the facility would be better off with men than women."

The other staring and following cases cited in Judge Tjoflat's dissent also involve egregious conduct that is missing here. Westvaco Corp. v. United Paperworkers Intern., 171 F.3d 971, 972-73 (4th Cir. 1999) (going into plaintiff's office and staring but accompanied by calling her at home; leaving messages with heavy breathing, panting, and "love you, baby"; addressing her as "foxy mama" and "foxy lady" for a year; asking for a kiss and, when she refused, saying "I am serious, I want some tongue"); Stoll v. Runyon, 165 F.3d 1238, 1239 (9th Cir. 1999) ("stalking" is alleged but the court also described the "gruesome facts" as "[n]umerous male coworkers and supervisors asked [plaintiff] to perform oral sex on them, commented on her body, shot rubber bands at her backside, asked her to wear lacy black underwear for them, bumped and rubbed against her from behind, pressed their erect penises into her back while she was sorting mail and unable to get away, followed her into the women's bathroom, asked her to go on vacations, 'stalked her throughout the postal facility,' and fondled her body"); Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 570-74 (8th Cir. 1997) (involving Brewer's "following her around the store" but also involving testimony that harassers Brewer and Mais treated their women employees differently than men, with these examples: Brewer made overt sexual remarks to plaintiff and comments on her body; Brewer smacked his lips with kissing noises at her; Mais kicked her legs when he walked by; Mais called her "mother fucker" and "lazy-son-of-a-bitch," commented on her "tight-ass jeans," used profanity with her; Brewer called her "damn dummy," "stupid," and "idiot" daily, and yelled at her for extended periods, telling her he wanted her to work on the ladder so he could see her "cute ass"; Brewer yelled and swore at other female employees; plaintiff complained to store manager about Brewer's "behavior, drinking and intimidation"; Mais gestured with a screwdriver toward plaintiff's rear; and Mais and Brewer "directed harsh treatment, abusive language, and profanity at women, but not at men"); Yamaguchi v. U.S. Dep't of the Air Force, 109 F.3d 1475, 1478 (9th Cir. 1997) (alleging that harasser not only "stare[d] at her during work" but also made "inappropriate jokes and comments and sen[t] [plaintiff] unwanted notes, gifts and e-mail messages," attempted to kiss her, made "sexual gestures and remarks about her body, perfume, and clothing and about other women in the workplace"; came to plaintiff's apartment and "allegedly tied her up, gagged her and raped her"); Harris v. L&L Wings, Inc., 132 F.3d 978, 980 (4th Cir. 1997) (alleging the main harasser "followed her around the warehouse," but also that he "grabbed [plaintiff], embraced, her, stroked her hair, massaged her back and shoulders, fondled her legs," "pinned [plaintiff] against a box and tried to kiss her," persistently "boasts . . . about his sexual prowess, offers to promote her in exchange for dating him, and another offer of a hundred dollars if [plaintiff] would go to bed with him," "offered to reward [plaintiff's] son with a raise if he would convince his mother to go out with him," "[e]very time [plaintiff] encountered [harasser], he would either touch her or make vulgar comments or sexual advances to her or both"); Hathaway v. Runyon, 132 F.3d 1214, 1217 (8th Cir.

24

Were we to conclude that the conduct established by Mendoza was sufficiently severe or pervasive to alter her terms or conditions of employment, we would establish a baseline of actionable conduct that is far below that established by other circuits. For example, in <u>Baskerville v. Culligan International Co.</u>, the Seventh Circuit

---

1997) (the harasser "stared at her with a menacing look," but also was "getting physically close and making peculiar comments, telling [plaintiff] that other workers believed they were romantically involved," making "physical sexual advances," such as "he hit her on the buttocks with a clipboard," and a week later "squeezed her buttocks"; plaintiff regularly had to interrupt her work in order to avoid encountering the harasser, and "[a]fter [plaintiff] rebuffed the [harasser's] advances, he began to snicker and laugh at her, making guttural noises when she walked by him"); <u>Hirase-Doi v. U.S. West Communications, Inc.</u>, 61 F.3d 777, 780-81 (10th Cir. 1995) (alleging "threatening and intimidating stares" but also that the harasser was "making verbal and written sexually offensive remarks propositioning [plaintiff] and attempting to touch her breast"; after plaintiff reported the harassment, he "grabbed [plaintiff] between her legs"; also made "persistent requests for sex [to two other females] and inquiries of their sexual conduct," "open-ended invitations to all female employees to satisfy his sexual desires," "passed a sexually explicit note" to another female employee, "attempted to kiss [another female employee] on the neck and brushed her breast with his hand"); <u>Steiner v. Showboat Operating Co.</u>, 25 F.3d 1459, 1461-63 (9th Cir. 1994) (alleging "stares, glares, snickers, and comments," but along with "habitually refer[ring] to [plaintiff] and to other female employees in an derogatory fashion using sexual explicit and offensive terms," such as calling plaintiff "dumb fucking broad," "cunt," and "fucking cunt"; also yelling "why don't you go in the restaurant and suck their dicks . . . ."); <u>Cortes v. Maxus Exploration Co.</u>, 977 F.2d 195, 197-98 (5th Cir. 1992) (alleging supervisor "would follow her and wait in the hall until she returned" but along with "propositioning [plaintiff] seeking sexual favors," "repeatedly asked [plaintiff] to have sexual relations with him, sometimes threatening to demote or fire her if she refused," "made lewd remarks about her body, told her vulgar jokes on a daily basis, showed her pornographic photographs, asked her to come to his house for 'training' after work hours," "bragged about the size of his penis, and frequently brushed up against her legs and breasts," and after plaintiff complained, the harasser "then began requiring that [plaintiff] ask his permission . . . to go to the restroom" and "[w]henever she asked to go the restroom, [the harassser] would follow her and wait in the hall until she returned").

The dissent's cases vividly demonstrate why Mendoza's hostile environment claim is not actionable and why holding that her claim is actionable would deviate significantly from the law of other circuits.

25

considered a sexual harassment-claim consisting of nine instances of sexually-graphic behavior by the alleged harasser over a period of seven months. 50 F.3d 428, 430 (7th Cir. 1995). These instances included diminutive references to the plaintiff as a "pretty girl" and a "tilly" and one particularly obscene instance in which the alleged harasser simulated the act of masturbation. Id. The Seventh Circuit acknowledged the obvious offensiveness and vulgarity of this conduct, but nonetheless concluded that these events could not "reasonably be thought to add up to sexual harassment." Id. The Seventh Circuit expressly held that "[w]e conclude that no reasonable jury could find that Hall's remarks created a hostile working environment." Id. at 431.[9] Likewise,

---

[9]In Baskerville, the Seventh Circuit made an alternative holding that in any event the plaintiff loses because the defendant company took all reasonable steps to protect plaintiff from Hall and was not vicariously liable. Baskerville v. Culligan International Co., 50 F.3d 428, 431-32 (7th Cir. 1995). However, the initial and primary holding was that Hall's conduct did not add up to actionable sexual harassment. Id. at 428-31. The Seventh Circuit also affirmed this Baskerville holding in Gleason v. Mesirow Financial Inc., 118 F.3d 1134 (7th Cir. 1997). The Gleason court stated, "We held in Baskerville [that Title VII] was 'not designed to purge the workplace of vulgarity,' for a certain amount of 'vulgar banter, tinged with sexual innuendo' is inevitable in the modern workplace . . . ." Id. at 1144 (quoting from Baskerville, 50 F.3d at 430-31). The court continued, "Our specific holding in Baskerville was that plaintiff's supervisor had not engaged in actionable sexual harassment even though over a seven-month period, he was guilty of the following: (1) called the plaintiff a 'pretty girl,' (2) made grunting sounds when the plaintiff wore a leather skirt, (3) said to the plaintiff that his office was not hot 'until you walked in here,' (4) stated that a public address announcement asking for everyone's attention meant that 'all pretty girls [should] run around naked,' and (5) alluded to his wife's absence from town and his loneliness, stating that he had only his pillow for company while making an obscene gesture." Id. at 1144.

The court in Gleason reiterated that the "central teaching of the Baskerville opinion [is that] 'low-level harassment' is not actionable--[this holding] was recently re-affirmed by another panel of this court in Galloway v. General Motors, 78 F.3d 1164, 1168 (7th Cir. 1996). Thus, it is established in this circuit as of this date that there is a 'safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of sex.'" Id.

26

in Shepherd, the plaintiff produced evidence of several fairly serious instances of harassment including: (1) the statement "your elbows are the same color as your nipples;" (2) the statement "you have big thighs"; (3) attempts to look down the plaintiff's clothing; and (4) multiple instances of touching. 168 F.3d at 872. Similar to the Seventh Circuit's reasoning in Baskerville, the Fifth Circuit in Shepard noted that the conduct was "boorish and offensive." Id. at 874. The Court, however, specifically found that the conduct was not severe, threatening, or an impediment to job performance and therefore concluded that the plaintiff could not establish a hostile-environment claim. Id. at 874-75. Although we need not endorse or adopt the conclusions in Baskerville, Shepard, or the other cases cited herein, these decisions illustrate that conduct that is much more severe and pervasive than the conduct shown by Mendoza has been found insufficient as a matter of law to sustain hostile-environment claims.[10]

---

[10]Sexual harassment in the workplace is a serious matter. However, beyond taking us out of step with the other circuits, holding that the conduct here constitutes sexual harassment actionable under Title VII would trivialize true instances of sexual harassment. See, e.g., Dees v. Johnson Controls World Services, Inc., 168 F.3d 417, 422 n.12 (11th Cir. 1999) (noting that "almost daily" abuse including sexual jokes, references to the plaintiff's body, and physical harassment established sexual harassment); Splunge v. Shoney's, Inc., 97 F.3d 488, 490 (11th Cir. 1996) (reasoning evidence that the harassers "grabbed Plaintiffs, commented extensively on their physical attributes, showed them pornographic photos and videotapes, offered them money for sex, favored other employees who had affairs with them, speculated as to the plaintiffs' sexual prowess, and so on" was sufficient to establish a hostile environment).

Both dissents cite decisions from other circuits which they contend found conduct as serious or less serious than Page's sufficiently severe or pervasive to be actionable sexual harassment. However, when all alleged conduct in those decisions is accurately listed, these decisions, if

anything, highlight the insufficiency of Mendoza's evidence. Williams v. General Motors, 187 F.3d 553, 558-59 (6th Cir. 1999) (these comments on different occasions: supervisor looked at plaintiff's breasts and said "You can rub up against me anytime"; supervisor said "You would kill me, [plaintiff's name]," "I don't know if I can handle it, but I'd die with a smile on my face"; as plaintiff bent over, "Back up; just back up," or "You can back right up to me"; while placing his arm around her neck and his face against hers, said "You left the dick out of the hand"; co-worker used the "F-word," "Hey slut," "I'm sick and tired of these fucking women"; and plaintiff encountered "pranks" including finding office supplies glued to her desk, being hit by a thrown box, and being locked in her work area); Rorie v. UPS, Inc., 151 F.3d 757, 761-62 (8th Cir. 1998) (facts considered on the borderline of actionable harassment, but described as manager McFadden "often would tell [plaintiff] that she smelled good, pat her on the back, and brush up against her," and "[t]his behavior continued throughout her employment with UPS"; he "was constantly 'coming on' to her" and was "always flirty" and said "this was '[j]ust the way he [was] with women'"; "[r]ecognizing" McFadden's telephone call to plaintiff's home – asking her to go swimming and if she "had heard rumors about a co-worker's penis" and stating she "looked better in the UPS uniform than other women" – falls outside of 180-day period, but stating "we believe that, at the very least, McFadden's comments suggest that his later behavior presents a jury question as to hostile environment"); Howard v. Burns Bros., Inc., 149 F.3d 835, 838-39 (8th Cir. 1998) (co-employee "always saying sexual innuendos," such as plaintiff "had nice legs and that he was 'going to get [her]'"; he would "often brush against [plaintiff] intentionally while the two of them were working in the narrow area behind the fuel counter"; once he "brushed her buttocks and she kicked him"; he "said and did inappropriate things to other female employees"; another employee complained that he would "touch [her] butt or put his arm around [her]" or "talk nasty"; calling another employee a "fucking bitch"; other co-employees complained of two jokes "in which the punch line involved lewd gestures, in one instance, touching a woman's breast, and in the other, thrusting his hips into a woman from behind"); Gallagher v. Delaney, 139 F.3d 338, 343-44 (2d Cir. 1998) (supervisor told plaintiff "he had a dream that she kissed him"; three days later he gave her a potted plant; the next day, told her "the only place for her to sit was on his lap"; "invited her to lunch on numerous occasions"; then gave her more gifts, including jewelry, teddy bear, pink rose, angel book; sent her cards with handwritten notes that read "Believe me, you [sic] the last person on Earth I want to see hurt"; complimented her on her physical appearance; asked her personal questions; "told her she brought out feelings in him that he had not had since he was sixteen"; invited her to Atlantic City and asked her to keep her dance card free; gave her a Valentine's card with printed message, "But somehow it seems only right To say, today of all days, You're someone close in thought and heart, Not 'now and then,' but always"); Barna v. City of Cleveland, Nos. 96-3971, 96-4178, 97-4138 (6th Cir. 1998) (sexual harassment occurred on a daily basis and involved a constant stream of sexual propositions, comments, advances, characterizations and gestures, including asking plaintiff for oral sex; at one point harasser "grabbed her" and "squeezed so hard" that her breasts were "crushed," while whispering "We're friends, aren't we honey. I could take care of you"; harasser's bragging about his sexual prowess to plaintiff); Carrero v. New York City Housing Authority, 890 F.2d 569, 578 (2d Cir. 1989) (harasser "constantly touching [plaintiff] and attempting to bestow unasked for and unacceptable kisses upon her"); Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1412-

## V.    Conclusion

For the foregoing reasons, we conclude that the district court did not err in granting Borden judgment as a matter of law on Mendoza's sexual-harassment claim under Title VII. We agree with the panel's decision in this case that the district court properly granted summary judgment and judgment as a matter of law on Mendoza's other claims. Therefore, we affirm the district court's entry of judgment in favor of Borden on Mendoza's claims for age discrimination, disability discrimination, retaliation, and Mendoza's state-law claims. The judgment of the district court is **AFFIRMED**.

---

15 (10th Cir. 1997) (six clearly sexual and severe disparaging remarks, such as plaintiff "would be the worst piece of ass that I ever had"; told plaintiff to "get a little this weekend" so she would "come back in a better mood"; she "would find a decent man if [she] just quit dating Mexicans"; she "must be a sad piece of ass" who "can't keep a man"; plaintiff was the only full time female employee in small office with supervisor harasser and three male co-employees, two of whom saw the conduct and testified that supervisor's conduct towards her was "sexually inappropriate," "offensive," and "intimidating").

EDMONDSON, Circuit Judge, concurring:

I concur in today's judgment and court opinion.

I write separately on a point, which the court's opinion does not reach, that I think deserves some attention: the essence of a Title VII case, including one based on a claim of sexual harassment, is plaintiff's proof of actual discrimination. And in this case, plaintiff never presented evidence that other employees -- particularly men -- at her workplace were treated considerably differently and better than she was treated. This failure of proof (apart from other reasons) warranted the district court's grant of a judgment as a matter of law for defendant.

Plaintiff says she, at the job site, was "constantly" observed and followed by her supervisor. She says her supervisor brushed against her once at the fax machine. She also says that, after she angrily entered her supervisor's office (where he was already meeting with another employee) and said she was there "to work, period," the supervisor replied "Yeah, I'm getting fired up, too." And she says, on two or three occasions, the supervisor (after looking her up and down) looked in the direction of her groin and sniffed.

Nothing in the record suggests that other employees, including men, were treated differently. When plaintiff was asked if other employees were treated the same as she was treated, she testified that she did not know.[1]

Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace.[2] It is an anti-discrimination statute. Title VII provides, in pertinent part:

It shall be an unlawful employment practice for an employer --

> (1) to fail or refuse to hire or to discharge any individual, or <u>otherwise to discriminate</u> against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

42 U.S.C. § 2000e-2(a) (emphasis added). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 118 S. Ct. 998, 1002 (1998) (citations and

---

[1]This question and answer is all that we have to go on about how other people were treated:

Q:   Well, you say [your supervisor] smiled at you. But, in fact, he smiled at other employees, also, didn't he?

A:   I don't know what he did with other employees.

[2]<u>See</u>, <u>e.g.</u>, <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 118 S. Ct. 998, 1002 (1998) ("Title VII [is not] a general civility code[.]"); <u>Meritor Sav. Bank, FSB v. Vinson</u>, 106 S. Ct. 2399, 2405 (1986) ("[N]ot all workplace conduct that may be described as 'harassment' [is actionable.]").

internal quotations omitted). But in this case, plaintiff made no effort to show that she was treated differently and less favorably than male employees.

The conduct of which plaintiff complains is neither obviously sexual in nature nor even sex-specific. That supervisors regularly look at employees or place themselves in the same common areas of the workplace as employees can occur whether the employees are men or women. A supervisor can bump into men at the office occasionally. The phrase "I'm getting fired up, too" is not necessarily (and frequently is not) a sexual statement. The words can readily be explained as either a statement of anger or exasperation which could have been aimed at any employee -- man or woman -- who interrupts a conference to inject some heated protest towards the supervisor. Even the looking-and-sniffing incidents are not unambiguously sexual gestures. To sniff at something or someone is commonly understood to be a sign of contempt or disdain; a man or a woman could be the subject of that disdain and of that treatment.

My thought is not that the supervisor's conduct in this case could not possibly have sexual connotations. I suppose that almost every act can -- depending on context, tone of voice and so on.

My thought is this one: at least when the sexual content of a supervisor's conduct is not obvious, a plaintiff asserting a claim of sexual discrimination in

employment must present some evidence that plaintiff's coworkers, those not of plaintiff's sex, were treated differently and better.[3]  Otherwise, Title VII's <u>vital</u> element -- discrimination -- is read out of the statute.  The plaintiff's burden to show that similarly situated employees were treated better is not a heavy one; ordinarily, the plaintiff testifies to that circumstance herself or himself.  But that the burden can usually be met easily by a properly motivated plaintiff does not mean that meeting the burden is a meaningless formality or that actual evidence is unrequired.  This evidence -- evidence of  the discrimination -- is the heart of the case.  And, therefore, courts must allow no fudging on the proof.

Here plaintiff put forward just two witnesses, including herself.  Neither of the witnesses claimed to know whether other employees -- especially men -- were treated significantly differently and better than plaintiff.  Discrimination based on plaintiff's sex must be proved in harassment cases.  The proof of discrimination was insufficient.

---

[3]Sometimes harassment plaintiffs are complaining of conduct that is definitely sex-specific or very clearly sexual in nature, for example, an invitation by a supervisor to engage in sexual intercourse.  In those distinctive cases, the discrimination might be inferred from the conduct (it is circumstantial evidence of discrimination based on sex) without further evidence: in the example, it is too unlikely that the same invitation would have been made by the same supervisor to a person of a different sex than plaintiff.  But this footnote's example illustrates an exceptional case. A claim of sexual harassment is a claim of disparate treatment.  The rule is that the plaintiff must actually prove discrimination, normally by evidence showing directly that similarly situated persons not of plaintiff's sex were treated differently and better.

33

This failure of proof by itself warranted the district court's grant of a judgment as a matter of law for defendant.

CARNES, Circuit Judge, concurring:

Concurring fully in the judgment of the Court and in Judge Hull's opinion for it, I write separately to discuss the reluctance courts should have about permitting plaintiffs who claim sexual harassment to rely upon their subjective interpretations of ambiguous conduct. An essential part of Mendoza's contention that she was sexually harassed is based upon her perception that Page, her supervisor, constantly followed her around and stared at her. That is her perception, or more specifically, what she testified at trial is her perception, of the frequency and the manner in which Page went to where she was in the work place and looked at her during the eleven months she was under his supervision.

Mendoza's perception that Page had followed her around and looked at her in an offensive way brings to mind a recent Seventh Circuit case in which the plaintiff perceived that her boss had regularly talked to her in a "sexy voice." See Minor v. Ivy Tech State College, 174 F.3d 855 (7th Cir. 1999). The Seventh Circuit's treatment of the "sexy voice" contention in Minor is instructive. The plaintiff in that case was employed by a public vocational college whose chancellor, a man named Cole, had an office in another town. She claimed that for eleven months Cole called her "almost every day, rarely discussing business." Id. at 856. The court described the plaintiff's perception of these daily phone calls as follows:

35

Cole talked, she thought, in a very friendly way, the way a boyfriend might talk; his voice was sexy; and though he never asked her for a date or proposed any sexual or otherwise erotic connection, she believed that his calls constituted overtures awaiting a response from her. She says that his words were at times "stalker-like" and "had these overtones at certain times that were sexual," but she does not indicate what the words were that gave her these impressions.

Id. The plaintiff in Minor also said that Cole, her boss, once entered her office and told her he had been watching her through a window, which she thought was "lecherous of Cole," and it really scared her. Id. There was objectionable conduct, including Cole putting his arms around her, squeezing her, and kissing her while saying, "Now, is this sexual harassment?" Id. at 857.

The Seventh Circuit affirmed the grant of summary judgment for the defendant in Minor, holding that the "sexy voice" conduct was outside the period of limitations and should not be considered. But the Court went on to hold in the alternative that even if that conduct was considered, there was still insufficient evidence of sexual harassment to avoid summary judgment. The Seventh Circuit explained why this had to be so:

As for Cole's "sexy voice," we are concerned about the legal risk that would be placed on employers if a plaintiff in a sexual harassment case could get to a jury on the basis of nebulous impressions concerning tone of voice, body language, and other nonverbal, nontouching modes of signaling. It is one thing to tell a supervisor that he should

36

not propose sex to a subordinate, display pornographic pictures to her, or touch her in a suggestive fashion; those are indeed things that an employer should tell its supervisors not to do. It is another thing for an employer to be required under pain of legal sanctions to make sure that its supervisors never inflect their voice or posture in such a way that a woman might think they were "coming on" to her. That would be a counsel of perfection, and the aims of Title VII are more modest.

Id. at 858.[1]

---

[1]The Minor Court correctly recognized that "stalking a female employee crosses the line," id. at 858, but also rejected any notion that the employee's perception of whether she had been stalked is controlling. The plaintiff in that case testified that she perceived the conduct of Cole, her supervisor, to be "stalker-like." Id. at 856. Instead of accepting her characterization, or even considering it as evidence ("there is no evidence of [stalking] here"), the court considered the objective conduct involved and reached its own conclusion, which is that there had been no stalking. Id. at 858.

In reaching that conclusion, the Minor court noted: "Cole did not follow Minor about, or drive past her home, or call her late at night, or query her about her personal life. He did not engage her in conversations about sex or love." Id. at 858. Although Mendoza did testify that Page followed her about the workplace, that is not enough to distinguish this case from Minor – to make this a "stalker" case. As the context of Minor's remark about Cole not following Minor about makes clear, the court there was talking about off-hours conduct ("or drive past her home, or call her late at night"), or conduct that had no conceivable connection to supervisory duties ("He did not engage her in conversations about sex or love."). The court was not talking about an employee's perception of on-the-job conduct by a supervisor whose duties included observing employees.

That the present case does not involve stalking is obvious from the undisputed fact, which the Court's opinion makes clear, that it never occurred to Mendoza and her attorney, to use the word "stalking" to describe Page's conduct. They did not do so in the trial court, in their panel briefs, or in their en banc briefs. So far removed are these facts from a stalking case that it never occurred to anyone at the pre-trial, trial, or panel appeal levels of this case to describe Page as a stalker. The remarkable revelation that this is a stalking case has come only to the authors of the dissenting opinions at this, the en banc stage. Their insight in this regard is as belated as it is unique. What appears so obvious to them now apparently never occurred to either of them at the panel stage, because their carefully crafted panel opinion fails even to mention the word "stalk" or any derivative of it.

37

Likewise, it is "another thing" for an employer to be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they were "coming on" to her. That would be, in the Seventh Circuit's words, "a counsel of perfection, and the aims of Title VII are more modest." Id. The Seventh Circuit in Minor also recognized that, "[i]t is no part of Title VII to change a 'hands on' management style (provided 'hands on' is understood metaphorically) merely because it might strike a suspicious employee as having sexual overtones." Id. The same is true of an "eyes on" management style. There is an objective as well as a subjective component to a sexual harassment claim. See Harris v. Forklift Systems, 510 U.S. 20, 21-22, 114 S.Ct. 367, 370 (1993). Stated somewhat differently, Title VII requires a baseline of objectively offensive conduct, and that baseline cannot be met with objectively ambiguous conduct that a suspicious employee subjectively perceives to be improper.

There are good reasons that this is so. In addition to those discussed by the Seventh Circuit in Minor, there is also the problem of perception prevarication. An employee who makes up or exaggerates a description of objective conduct runs a risk of being found out that is greater than the risk run by an employee who is attempting to make a case based upon her subjective impressions. There is more

temptation to exaggerate, to "puff," to put subjective spin on the facts.  A plaintiff describing her subjective impressions  can say that while her supervisor's conduct might have appeared neutral to some, she felt, believed –  just knew –  it was lecherous. That is what the plaintiff in <u>Minor</u> said about the voice her boss used when talking with her: she considered it "sexy" and stalker-like. <u>Id</u>. at 856.  Similarly, Mendoza testified that when her boss was looking at her, he was staring in an offensive manner; and when he turned up where she was in the workplace, he had followed her there.

And what could Page  or any other supervisor accused of doing something that was objectively neutral but perceived by an subordinate to be lecherous do  to rebut testimony about those perceptions?  If an employee says that her supervisor looked or stared at her in a sexy way, or spoke to her in a sexy voice, or did both things, how is a supervisor who is innocent of any lecherous intent or thoughts to establish his innocence ?  Supervisors must observe,  look at,  and speak to employees  they supervise;  they regularly  go about the work place to see what employees are doing, and sometimes follow them around on the work site.  And supervisors should be free to do so without being hauled into court every time an employee – who may well  have other reasons to be unhappy with the supervision – perceives the supervisor's constant presence, or the way he looks at her,  or the

tone of his voice, or the way he stands, or the way he walks, to be offensive to her.

This case illustrates the dangers of permitting litigation by perception. At her deposition, Mendoza was questioned about her claim that Page had followed her around the workplace:

> Q. The second thing you mentioned was that Dan Page followed you all over the place.
>
> A. Yes, he did, several times. This happened several times, two, three times that I can remember. I would go to the routeman's room reference paperwork. And when I would come out, go to the left to go back to my office, he would be at the end of the hall and watching me and smiling at me. Several times I laughed in his face. He might have taken it to be a smile like I enjoyed it. It wasn't a smile. I laughed in his face.

For Mendoza, the problem with her perception about Page following her around only "several times, two, three that I can remember," as she described it under oath at deposition, is that it was unlikely to get her to the jury, to give her a chance at recovery from the company that had terminated her because she failed to come to work for three consecutive days. Given the nature of perceptions, however, that was no problem for Mendoza. When she got to trial, she simply changed her perception. During her trial testimony, she no longer perceived that Page had

followed her around only "several times, two three times that I can remember," but instead perceived that he had followed her around "constantly."

The Court does well to rule out litigation by perception and require objectively offensive conduct that is itself severe or pervasive before a Title VII claim can go to a jury.

TJOFLAT, Circuit Judge, concurring in part, and dissenting in part, in which BIRCH, BARKETT and MARCUS, Circuit Judges, join:

In its zeal to discourage the filing of frivolous lawsuits, the Court today hands down an opinion that will certainly be used by other courts as a model of how <u>not</u> to reason in hostile environment sexual harassment cases brought under Title VII.[1] Ten years ago, in <u>Vance v. Southern Bell Telephone and Telegraph Company</u>, 863 F.2d 1503 (11th Cir. 1989), <u>overruled on other grounds</u>, <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989), this court set forth an analytical framework for deciding when, under the totality of the circumstances, the plaintiff's case of harassment is sufficient to withstand a defendant's motion for judgment as a matter of law.[2] In reversing the district court, we explained that the district court had erred in granting the motion because it had failed to consider all of the circumstances in context and had instead analyzed each alleged instance of harassment separately. Apparently, <u>Vance</u> has now either been forgotten or is being ignored, because the court today makes

---

[1] <u>See</u> Theresa M. Beiner, "The Misuse of Summary Judgment in Hostile Environment Cases," 34 <u>Wake Forest L. Rev.</u> 71, 119 (1999) (positing that courts often grant motions for summary judgment and for judgment as a matter of law improperly because, in part, "the courts have seen a marked increase in Title VII claims generally, and in harassment claims in particular").

[2] The question in <u>Vance</u> was whether the plaintiff's case was sufficient to withstand a motion for judgment notwithstanding the verdict (JNOV) under Fed. R. Civ. P. 50(b). <u>See</u> 803 F.2d at 1505-06. Rule 50(b) has now been amended to substitute the term "judgment as a matter of law" for directed verdict and JNOV.

42

exactly the same mistake the district court made in that case ten years ago. I, therefore, respectfully dissent from the majority's holding with respect to the plaintiff's sexual harassment claim brought under Title VII.[3]

I.

Title VII forbids an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1) (1994). Sexual harassment is a form of sex discrimination within the meaning of Title VII. See, e.g., Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 65-67, 106 S. Ct. 2399, 2404-05, 91 L. Ed. 2d 49 (1986). Two types of sexual harassment are prohibited by Title VII: quid pro quo harassment and hostile work environment harassment. See Fleming v. Boeing Co. 120 F.3d 242, 244 (11th Cir. 1997). In this appeal, we focus on Red Mendoza's allegations of hostile work environment sexual harassment.

In order to establish a hostile work environment sexual harassment claim, an employee must show: (1) that the employee belongs to a protected group; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment

_____

[3] I concur with the judgment of the court in all other respects.

43

was based upon the employee's sex; (4) that the harassment was sufficiently severe or pervasive to alter a "term, condition, or privilege" of employment and create an abusive working environment; and (5) a basis for holding the employer liable. Henson v. City of Dundee, 682 F.2d 897, 903-905 (11th Cir. 1982).

With regard to the fourth element, sufficient severity or pervasiveness, the harassing conduct must create both an objectively hostile or abusive environment – one "that a reasonable person would find hostile or abusive" – and a subjectively hostile or abusive environment – one that "the victim . . . subjectively perceive[s] . . . to be abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993).

In determining whether a plaintiff has met the burden of alleging sufficient harassment, the Supreme Court has recently reaffirmed "that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1003 (1998) (quoting Harris, 510 U.S. at 23, 114 S. Ct. at 371). If there is one principle of law that stands out in this area, it is that courts must look to the totality of the circumstances to determine whether harassment is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. See Harris,

510 U.S. at 23, 114 S. Ct. at 371; <u>Vinson</u>, 477 U.S. at 69, 106 S. Ct. at 2406; <u>Henson</u>, 682 F.2d at 904.  Among other things, courts should look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  <u>Harris</u>, 510 U.S. at 23, 114 S. Ct. at 371.

The inquiry is both fact intensive, and contextually specific.  It "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target."  <u>Oncale</u>, 118 S. Ct. at 1003.  This means that behavior that might be experienced by an employee as perfectly innocent in one context can, when considered in light of other occurrences and behavior, take on a more incriminating flavor.  No act can be considered in isolation.  Depending upon the circumstances, an employer's comment to an employee that he or she "looks good today" could be construed as a friendly compliment, a harmless flirtation, or the kind of sexually offensive verbal assault that is "every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality."  <u>Henson</u>, 682 F.2d at 902.  To put the point yet another way,

> [a] professional football player's working environment is not severely or pervasively abusive . . . if the coach smacks him on the buttocks as he heads onto the field – even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female)

45

back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

Oncale, 118 S. Ct. at 1003.

## II.

We review the district court's grant of a Rule 50(a) motion for judgment as a matter of law de novo, considering all the evidence in the light most favorable to Mendoza, the non-moving party. Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997), cert. denied, Combs v. Meadowcraft Co., 118 S. Ct. 685 (1998). A directed verdict is only proper when "[t]he facts and inferences . . . 'so overwhelmingly favor the verdict' that no reasonable juror could reach a contrary decision." Bivens Gardens Office Bldg., Inc. v. Barnett Banks, Inc., 140 F.3d 898, 905 (11th Cir. 1998) (quoting Hibiscus Assocs. v. Board of Trustees, 50 F.3d 908, 920 (11th Cir. 1995)). Thus, to affirm the judgment as a matter of law, we must be convinced that no reasonable juror could have concluded that the conduct complained of constituted actionable sexual harassment in violation of Title VII.

## III.

46

Before Mendoza went to work in the accounting department of Borden's Miami facility, she spent some time as a cocktail waitress in restaurants, bars, and hotel lounges. Her work environment was often pervaded by foul language and personal insult. Some customers, doubtless after a few libations, attempted to approach Mendoza sexually. On at least one occasion Mendoza was followed home from work, and she was propositioned for dates several times. Throughout it all, Mendoza never made a claim of sexual harassment. At trial she stated that "it was just part of the job."

In December 1993, Mendoza found work as a temporary employee at Borden. For six months she experienced no job related difficulties that could give rise to a Title VII lawsuit. In fact, Mendoza was so successful in her temporary position that she was eventually hired as a permanent employee and given a pay raise. All of that changed when Dan Page came to work at Borden in 1994. Page was hired as the plant's "Controller," the highest ranking position at the Miami facility. From his glass enclosed office, Page kept a watchful eye on the employees in the accounting department, all of whom knew that their job security and employment possibilities rested in his hands.

Page kept a particularly watchful eye on one employee – Red Mendoza. In early 1995, Page began to "constantly" follow Mendoza around the plant, and stare

47

at her in a suggestive manner. Page's stalking and leering continued for at least four months until Mendoza finally left Borden in April 1995. Mendoza testified that Page "always seemed to be wherever I was. If I was in the lunch room, he was there. If I was at the picnic table outside on a break, he was there." Page did not limit his physical pursuit of Mendoza to the actual office in which they both worked. He followed her in the plant's hallways and outside to the facility's picnic area.

Unfortunately for Page, his physical pursuit did not have its intended effect of peaking Mendoza's interest, and so he decided to use other methods of beguilement. Perhaps hoping that Mendoza would see his true "animal magnetism," Page stared at Mendoza's groin on at least three occasions and made a loud, sniffing sound. For unexplained reasons, Mendoza failed to become enraptured. In fact, she became rather terrified. But Page remained undaunted. Because Mendoza was not succumbing to his Casanova-like charms, he decided to make physical contact. One day when Mendoza was at the fax machine, Page walked over and moved his hips into hers while grabbing her shoulders and smiling at her. As inexplicable as it may seem, this again failed to capture Mendoza's favorable attentions.

By now Mendoza had also had enough. She had been stalked, leered at, touched on her hips and shoulders, and her groin area had been made the object of a sniffing ritual so bizarre that only Page could understand its true import. Jenny Voltapetti[4] testified that on at least twelve occasions Mendoza told her that she was "being harassed on the job," and that "it was an immediate supervisor." Voltapetti described Red Mendoza, a woman who had accepted as "just part of the job" being propositioned and followed home from work during her years as a cocktail waitress, as "extremely distraught" and "very upset." But what could Mendoza do? With instances of co-worker harassment or even in many situations where one's superior is doing the harassing, the employee has access to channels of complaint – the head boss or somebody who is superior to the superior. In this situation, however, Page was the head boss. He was the highest ranking employee at the Miami plant. Mendoza nevertheless went to Page to tell him that she had come there "to work, period." Page's only response was that he was "getting fired up, too."

IV.

---

[4] Jenny Voltapeti is the wife of Mendoza's dentist, and she also manages his office. Her testimony is based upon conversations she had with Mendoza during several of Mendoza's dental visits.

These are the facts when we view the evidence in the light most favorable to Mendoza, as we are required to do in reviewing a judgment as a matter of law. Reading the majority opinion, however, one would think that we are required to view the facts in the light most favorable to the <u>defendant</u>. The <u>en banc</u> opinion reads like a defense attorney's classic attack on a plaintiff's (or a prosecutor's) circumstantial evidence case. Contrary to the Supreme Court's direction, what the majority does is examine each instance of alleged harassment in isolation and then declare that it alone could not support a finding of liability. Because of this, and here is the rub, all of the evidence added <u>together</u> is likewise insufficient to satisfy the <u>Harris</u> requirement of severity or pervasiveness.

The majority declares that "Page's statement 'I'm getting fired up' and the sniffing sounds are hardly threatening or humiliating."[5] <u>Ante</u> at 22. With that

---

[5] It is a mystery to me how the court could find that the sniffing sounds, in particular, "are hardly . . . humiliating." The majority brushes over this piece of evidence lightly, but one wonders what response, if not humiliation mixed with indignation, would be appropriate for a situation in which a woman's supervisor at work feels the need to stare at her groin while making sniffing sounds. Perhaps the court views such conduct as normal and acceptable workplace behavior. <u>See generally</u> Daniel Patrick Moynihan, "Defining Deviancy Down," 62 <u>Am. Scholar</u> 17 (1993). In any event, the only case cited to support the majority's novel proposition is <u>Long v. Eastfield College</u>, 88 F.3d 300, 309 (5th Cir. 1996). In <u>Long</u>, the Fifth Circuit took the entirely unremarkable position that one "offensive joke concerning condoms . . . told in [the plaintiff's] presence" could not, alone, form the basis of a hostile work environment claim. <u>Id.</u> From that case, the majority draws the conclusion that "the sniffing sounds are hardly threatening or humiliating." How the court could compare one joke, the subject of which was a prophylactic (and not the plaintiff's genitalia), told, apparently, not to the plaintiff, herself, but only "in [the plaintiff's] presence," to this case, where Mendoza has alleged multiple instances of Page staring directly at her groin (targeting Mendoza, specifically) and sniffing at her like some beast marking its prey, is beyond me.

50

evidence conveniently disposed of, the court then moves on to scoff at "the one instance of Page brushing his hip against Mendoza's." Id. Last, we are told that Page's constant following and staring at Mendoza in a sexually suggestive manner cannot save the claim, because "[g]iven normal office interaction among employees, following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable . . . ." Id. at 24.[6]

---

[6] The court's casual assertion that "Mendoza did not present evidence that Page's conduct was 'physically threatening or humiliating' or that the cumulative effect of this conduct 'unreasonably interfered' with Mendoza's job performance" is bizarre. Ante at 21-22. In order for this assertion to be correct, Mendoza would have had to have taken the stand at trial, and then remain completely silent when questioned by her attorney. Remarkably, however, Mendoza did testify when she took the stand, and she presented a wealth of testimonial evidence that Page stalked and leered at her, sniffed at her groin, touched her, and made inappropriate sexual remarks. The inference that a reasonable jury could draw from this evidence is that Mendoza felt threatened and humiliated, and that Page substantially interfered with Mendoza's job performance.

There are only two possible conclusions that I can draw from the court's conclusion that Mendoza "did not present [any] evidence." The first is that in order for a plaintiff to be deemed to have presented "evidence that [the] conduct was 'physically threatening or humiliating' or that the cumulative effect of [the] conduct 'unreasonably interfered' with [the plaintiff's] job performance," the court is now requiring that the plaintiff use "magic words" in her trial testimony, because we will no longer permit either juries, or ourselves, to draw inferences from the testimony presented. If this is the correct interpretation of the majority's statement, then henceforth, we will be requiring plaintiffs in hostile environment cases to recite the Harris factors, verbatim, in their testimony in order to for us to recognize that the harassment was "frequen[t]," "sever[e]," "physically threatening or humiliating," and an "unreasonabl[e] interfere[nce] with an employee's work performance." Harris, 510 U.S. at 23, 114 S. Ct. at 371. In order to be adequate, the transcript from Mendoza's trial would have to read something like this:

Q: What did [Page] do that changed things?
A: The man was constantly watching me and following me around and looking me up and down, whether it was face to face with me or as I would get up from a lunch table or from the picnic table to walk away and to go back to the office. [And I noticed the frequency of this discriminatory conduct; its severity; that it was physically threatening and humiliating; and that it unreasonably interfered with my work performance.]
. . . .

51

Every defense attorney knows that this is the traditional way to undermine a case built upon circumstantial evidence. You isolate each piece that the other side puts into evidence and then attempt to trivialize it by taking it out of context. The defendant was just driving his car, the defense attorney will argue. So what of the fact that the car was parked outside a bank? People park outside of banks all the time. The bank was being robbed at the time? How could the defendant have

---

Q: Okay. Aside from the looking you up and down, what -- did he do anything else?
A: There was an incident where I was standing at a copy machine direct right next to his office. I was making copies. I felt somebody watching me. I looked directly to my right. He was sitting at a chair in the conference room, which is approximately 20, 25 feet away from me, at a chair at the end of the table. And he looked at me up and down, and stopped in my groin area and made a (indicating) sniffing motion. [And I noticed the frequency of this discriminatory conduct; its severity; that it was physically threatening and humiliating; and that it unreasonably interfered with my work performance.]

      This also happened another time. It had to be in March, I had the flu. I went into his office – he was sitting at his computer – to tell him that my doctor wanted me to take time off because of this flu. And he turned around to his right, looked directly at me, up and down, and stopped again in the groin area, made a sniffing motion again, (indicating), like that. [And again, I noticed the frequency of this discriminatory conduct; its severity; that it was physically threatening and humiliating; and that it unreasonably interfered with my work performance.]

The alternative inference that we might draw from the majority's statement is that we should not actually take the majority at its word, and that what the court means to say is that "Mendoza did not present [enough] evidence that Page's conduct was 'physically threatening or humiliating' or that the cumulative effect of this conduct 'unreasonably interfered' with Mendoza's job performance." This is, likely, the correct interpretation of the majority's conclusion; but if it is, the court completely fails to explain why Mendoza's evidence is insufficient. From on high, the majority has determined that female employees should feel no humiliation or anxiety when their bosses sniff in the direction of their groins, touch their hips, and follow them around the office, staring at them in a sexually suggestive manner; but the court never explains why this is the case. That the court feels the need to resort to bald assertion in lieu of providing some justification for its position only bolsters my conclusion that it is a jury (traditionally, the finder of fact) and not the court who should be making these determinations.

known that? He was sitting <u>outside</u> the bank, remember. And so what of the fact that defendant allowed the two men who <u>were</u> robbing the bank into his car, and then drove away at a high rate of speed? People drive at a high rate of speed all the time. Can the members of the jury actually say that they have never broken the speed limit?

The majority's analysis might be useful for a practicing seminar on defense strategies in employment discrimination cases, but it is certainly not faithful to the Supreme Court's direction that we look at the "constellation of surrounding circumstances" when analyzing the sufficiency of a plaintiff's allegations. <u>Oncale</u>, 118 S. Ct. at 1003. More than a decade ago in <u>Vance</u>, we addressed a district court that made the same analytical mistake in a racial harassment case that the majority makes today. In that case, the district court granted a directed verdict to the employer after examining independently each allegation of harassment, and finding either that the plaintiff had failed to make out a prima facie case for each incident, or that the defendant had provided a legitimate, nondiscriminatory reason for its conduct. After weeding out most of the plaintiff's allegations in this manner, the district court then ruled that the two remaining instances of harassment (a noose was twice hung over the plaintiff's work station) were insufficient to establish a "'persistent, pervasive practice.'" <u>Vance</u>, 863 F.2d at 1510 (quoting <u>Vance v.</u>

53

Southern Bell Tel. & Tel. Co., 672 F. Supp. 1408, 1413 (M.D. Fla. 1987)).  We

corrected the district court as follows:

> The prima facie showing in a hostile environment case is likely to consist of evidence of many or very few acts or statements by the defendant which, taken together, constitute harassment.  It is important to recognize that in assessing the credibility and weight of the evidence presented, the jury does not necessarily examine each alleged incident of harassment in a vacuum.  What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents.
> . . . .
> [T]he district court examined each individual allegation of discrimination in turn, and found that the plaintiff had made out a prima facie case of discrimination only as to the two noose incidents . . . . [But] as we stated in Henson, the severity of the harassment is to be determined by the totality of the circumstances.  It was thus incorrect for the district court to require that the plaintiff establish a prima facie case of discrimination as to each individual allegation that the jury could properly consider.  A hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits.

Id. at 1510-11 (citations omitted).

The majority today makes the same mistake as the district court did in

Vance.  By examining each of Mendoza's allegations of harassment in isolation

from one another, the majority concludes that Mendoza does not have enough

evidence to reach the jury because each allegation is individually insufficient.  But

the whole of a hostile environment sexual harassment case will often be greater

than the sum of its parts.  Incidents that might not seem so disturbing by

54

themselves can take on new meaning in the context of other evidence of discrimination. This case is a perfect example. By itself, it may not seem so significant that Page moved his hip into Mendoza's while touching her shoulder and smiling at her suggestively. But add to that a suggestive comment ("I'm getting fired up"). Now the hip incident begins to look a little more troubling. By the time we get to the repeated incidents of Page's staring directly at Mendoza's groin and making sniffing sounds, we realize that Mendoza's whole employment experience at Borden's may have been pervaded by overt and highly offensive acts of sexual aggression. Once we take all the evidence into account, we begin to appreciate that Page's constant following and staring at Mendoza may have been motivated less by a need to monitor employee work habits, than by a desire to stalk and terrorize an innocent female victim.[7] If we looked to the majority for guidance, however, we would miss all of this. We would miss the proverbial forest

---

[7] The majority, and Judge Carnes in his concurrence, make much of the fact that Mendoza never actually uses the word "stalking" to describe what Page was doing to her. What Mendoza testified to at trial was that Page "followed" her "constantly." Webster's Third defines "follow" as "to go after in pursuit or in an effort to overtake;" and it lists as synonyms the words "pursue," "chase," "tag," "trail," and "tail." Webster's Third New International Dictionary 883 (1993). "Constantly" is defined as "without variation, deviation, or change," or "with regular occurrence" (the listed synonyms are "ever," "always," and "incessantly"). Id. at 485. The verb-tense form of "stalk" is defined as "to pursue (as game) stealthily and often under cover for the purpose of killing," and "to pursue or follow in a stealthy, furtive, or persistent manner." Id. at 2221. Even if Mendoza never used the word "stalk" at trial, she certainly alleged that Page "pursued" her "incessantly," which is the same in substance as alleging that Page "stalked" her. Mendoza certainly never alleged that Page's stalking was "for the purpose of killing" her, but given the animal-like connotations of Page's sniffing ritual, she may have alleged that Page pursued her "as game."

55

for the trees because we would fail to see the cumulative meaning of Mendoza's allegations in context.

The court's analytical mistakes do not end here. As I read the majority opinion today, it appears that we are telling district courts that they should cast a skeptical eye towards a plaintiff's evidence of pervasive stalking and leering by a supervisor in hostile environment sexual harassment cases. The court writes that "[g]iven normal office interaction among employees, the following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable, even with evidence that the following and staring were 'constant' and thus 'frequent' under the Harris factors." Ante at 24. The first problem with this reasoning is that it is circular. The court answers the question, why are the following and staring alleged by Mendoza not the kind of conduct that can support a sexual harassment claim, with a most insightful response: because they "are not the [right] type of conduct." Id. This is plainly inadequate. The question deserves an answer, not a tautology.

But the real problem runs deeper. The logical inference that one draws from the court's statement is either: (a) that a plaintiff can never use evidence of following and staring by a supervisor to buttress a claim of sexual harassment; or (b) that in order for evidence of following and staring to be considered probative, it

56

must be something more than "constant." The answer almost certainly cannot be (a). No court has ever made such a sweeping declaration, defining an entire class of conduct as immune to suspicion. In fact, courts routinely use evidence of following and/or staring to support a finding of sufficient severity or pervasiveness. See Cross v. Alabama Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1495 (11th Cir. 1995) ("glaring looks, piercing looks"); Westvaco Corp. v. United Paperworkers Int'l Union, AFL-CIO, 171 F.3d 971, 973 (4th Cir. 1999) ("stare at her for periods of ten to twenty minutes"); Stoll v. Runyon, 165 F.3d 1238, 1239 (9th Cir. 1999) ("stalked her throughout the postal facility"); Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 571 (8th Cir. 1997) ("following her around the store"); Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1478 (9th Cir. 1997) ("stare at her during work"); Harris v. L & L Wings, Inc., 132 F.3d 978, 980 (4th Cir. 1997) ("followed her around the warehouse"); Hathaway v. Runyon, 132 F.3d 1214, 1217 (8th Cir. 1997) ("stared at her with a menacing look"); Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 780 (10th Cir. 1995) ("threatening and intimidating stares"); Steiner v. Showboat Operating Co., 25 F.3d 1459, 1462 (9th Cir. 1994) ("stares, glares, snickers, and comments"), cert. denied, 513 U.S. 1082, 115 S. Ct. 733, 130 L. Ed. 2d 636 (1995); Cortes v. Maxus Exploration Co., 977 F.2d 195, 198 (5th Cir.

1992) ("Whenever she asked to go to the restroom, [the supervisor] would follow her and wait in the hall until she returned.").[8]  Given the Supreme Court's repeated emphasis on social context, that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships[,]" Oncale, 118 S.Ct at 1003, it would make no sense for us to exclude, ex ante, a whole class of behavior from the realm of what might contribute to a finding of sexual harassment.

The court must, therefore, be saying that in order for evidence of following and staring to be considered probative, it must be something more than what Mendoza alleged.  It is difficult to imagine what that "more" might consist of.  Mendoza alleged that Page's following and staring were "constant," making his conduct appear to be the equivalent of stalking and leering.  See supra at n. 7.  But apart from the majority's failure to describe what kind of following and staring would be sufficiently harassing to "count" in an employee's claim for hostile

---

[8] The majority appears to have gone to some trouble to distinguish these cases.  See ante at 25-27, n. 8.  The court's purported distinction lies in the difference between the severity or pervasiveness of the harassing conduct at issue in the cases I cite, and the severity or pervasiveness of the conduct at issue in this case.  But I do not cite these cases for the proposition that courts have found conduct equivalent to that alleged by Mendoza to be sufficiently severe or pervasive to support a hostile environment sexual harassment claim ( I cite cases that establish that proposition, infra.); I cite them for the proposition which I state in the text of this opinion, that "courts routinely use evidence of following and/or staring to support a finding of sufficient severity or pervasiveness." Nothing in the majority's lengthy commentary discussing these cases undermines that proposition.

environment sexual harassment (must the harasser walk closer to the victim? touch her? breathe down her neck?), the court once again substitutes bald assertion for reasoned argument. Why is the following and staring "not the type of conduct that can render Mendoza's claim actionable"? We do not know. The court has cited no case to support this specific proposition; we must take it on faith that judges, and not juries, are the appropriate persons to be deciding what conduct can and cannot be interpreted as sufficiently offensive and harassing.

At the risk of appearing monotonous, let me repeat that behavior that might be experienced by an employee as perfectly innocent in one context can, when considered in light of other occurrences and behavior, take on a more incriminating flavor. And "[w]hat may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents." Vance, 863 F.2d at 1510. Certainly an employee's bare allegation that her supervisor was "following" her around the office and that the supervisor often "stared" at her while she was trying to work would not be sufficient to support a claim for harassment. But when that supervisor has been "following and staring" at the employee "constantly" for over four months, stared at the employee's groin and made sniffing noises, rubbed up against the employee's hips with his own while touching the employee's shoulder and smiling

59

suggestively, and made sexually suggestive remarks to the employee, then the "following and staring" begin to look more like "stalking and leering."

When analyzed cumulatively and in context, Mendoza has certainly presented enough evidence to survive Borden's Rule 50(a) motion for judgment as a matter of law. See Allen v. Tyson Foods, Inc., 121 F.3d 642, 647-48 (11th Cir. 1997). None of the cases cited by the majority supports the proposition that "the circuits have rejected sexual-harassment claims based on conduct that is as serious or more serious than the conduct at issue in this appeal." Ante at 15. If one carefully examines the cases the majority cites, one finds in every single one of them either that the conduct alleged was much less pervasive than the conduct at issue in this case, or that the case is inapposite for other reasons.[9] In this case,

---

[9] My reading of these cases convinces me that they do not stand for the proposition for which they are cited. Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264 (5th Cir. 1999), only involved five sexually related comments that "were no more offensive than sexual jokes regularly told on major network television programs." But the real trouble is that the court in Indest did not hold that the plaintiff's allegations were insufficient to establish a hostile environment. Instead, the decision affirmed summary judgment for the defendant because the employer had taken prompt remedial action and so the plaintiff could not establish a basis for the employer's vicarious liability for the actions of its employee:

> [W]e hold that because she promptly complained of [the supervisor's] harassing conduct, and because the company promptly responded . . . the district court properly granted judgment as a matter of law to [the defendant employer]. Even if a hostile work environment claim had been stated, which is dubious, [the employer's] prompt remedial response relieves it of Title VII vicarious liability.

Indest, 164 F.3d at 267. In Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2nd Cir. 1998), the plaintiff only alleged two instances of harassment (comment that plaintiff had the "sleekest ass" in the office, and a contact with plaintiff's breasts by some papers that the alleged harasser was holding in his hand), a far cry from Mendoza's claim of "constant" harassment. The same lack of pervasiveness is evident in Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998), where

60

the plaintiff alleged "no more than teasing about waving at squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched [plaintiff's] arm, fingers, or buttocks." The court in Adusumilli specifically affirmed the district court's exclusion of evidence that would have made the harassment at issue appear more pervasive. The district court struck a statement from the plaintiff's affidavit that she "was harassed on a near daily basis by [her] co-workers," because the court found that it was contradicted by the plaintiff's deposition testimony. Id. at 360. There is a similar lack of pervasiveness in Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1366 (10th Cir. 1997) (four relatively innocuous comments and one attempt to look down plaintiff's dress over a sixteen month period). Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164 (7th Cir. 1996) is inapposite. That case did not hold that plaintiff's allegations were "insufficient under Harris," ante at 17, in the sense that the harassment was not sufficiently severe or pervasive (the proposition for which the majority attempts to find support). Rather the court in Galloway went into a long discussion about why the harassing conduct (calling the plaintiff a "sick bitch") was not gender related at all because the alleged harasser was only calling the plaintiff "crazy" or "whacko," and thus there could be no liability under Title VII because there was no evidence of differential treatment. Galloway, 78 F.3d at 1167-68. In this case, the court purports to assume that the conduct alleged by Mendoza "is sexual in nature and thus might implicate sex discrimination." Ante at 21.

The citation to Black v. Zaring Homes, Inc., 104 F.3d 822 (6th Cir. 1997), would be effective, were it not for the court's reliance in that case on the fact that "most of the [allegedly harassing] comments were not directed at plaintiff." Id. at 826. In the instant case, there is no dispute that Page's harassment was directed specifically toward Mendoza (indeed, Page's sniffing was apparently directed specifically toward Mendoza's genital region). Kidwai v. McDonald's Corp., No. 93-1720 (4th Cir. Apr. 18, 1994), involved isolated incidents that were not nearly as severe or pervasive as the conduct alleged in this case (stating that plaintiff had a boyfriend; once asking plaintiff if she was in bed with someone; asking plaintiff to meet his mother; once asking plaintiff whether she had a good time on her vacation; asking plaintiff if she would cook for him; and using profanity on one occasion). With regard to Kidwai, it is odd that the court feels the need to resort to an unpublished opinion from the Fourth Circuit, given that citations to such cases are disfavored. 4th Cir. R. 36(c). The holding in Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333 (7th Cir. 1993), is on shaky ground because in that case, the court relied heavily on Scott v. Sears, Roebuck & Co., 798 F.2d 210 211-214 (7th Cir. 1986). The Seventh Circuit has since recognized that its holding in Scott -- that to be actionable, harassment must "cause such anxiety and debilitation to the plaintiff that working conditions [are] poisoned" -- has been effectively overruled by the Supreme Court's decision in Harris, 510 U.S. at 22, 114 S. Ct. at 370-71. See Saxton v. American Tel. and Tel. Co., 10 F.3d 526, 533-34 (7th Cir. 1993).

The two major cases that the majority uses to support its claim that "[w]ere we to conclude that the conduct established by Mendoza was sufficiently severe or pervasive to alter her terms or conditions of employment, we would establish a baseline of actionable conduct that is far below that established by other circuits" are Baskerville v. Culligan International Co., 50 F.3d 428 (7th Cir. 1995), and Shepherd v. Comptroller of Public Accounts, 168 F.3d 871 (5th Cir. 1999), petition for

Mendoza alleges that the harassment she experienced was "constant." This means that she was stalked and leered at <u>every day</u> for at least four months, in addition to being touched, verbally harassed, and sniffed at in a clearly sexual and disgusting manner. It may well be that at trial, a jury would conclude that Mendoza was not subject to sexual harassment that was sufficiently severe or pervasive to create a hostile work environment. Because the inquiry is so fact intensive and

---

<u>cert. filed</u>, 67 U.S.L.W. 3773 (U.S. June 11, 1999) (No. 98-1989). <u>Ante</u> at 27. <u>Baskerville</u> is not directly on point because that case was a pre-<u>Faragher</u> decision in which the court found that "even if . . . [the alleged harasser's] remarks could reasonably be thought to cross the line that separates vulgarity (not actionable) from harassment (potentially actionable), the plaintiff must lose because the company took all reasonable steps to protect her from [the alleged harasser]" and so was not vicariously liable. <u>Baskerville</u>, 50 F.3d at 431. In note 9 of its opinion, the majority attempts to resuscitate <u>Baskerville</u> by citing <u>Gleason v. Mesirow Financial, Inc.</u>, 118 F.3d 1134, 1144 (7th Cir. 1997), in which the court opined that the "specific holding in <u>Baskerville</u> was that the plaintiff's supervisor had <u>not</u> engaged in actionable sexual harassment . . . ." That may be true, but it does not change the fact that the "holding" in <u>Baskerville</u> that the harassment was not sufficiently severe or pervasive was, as the <u>Baskerville</u> court, itself, recognized, an "alternative ground for [the] decision." <u>Baskerville</u>, 50 F.3d at 432.

The only cases that the majority cites with any effectiveness are <u>Shepherd</u>, 168 F.3d at 872 (one comment that the plaintiff's elbows were the same color as her nipples; one comment that the plaintiff had big thighs; touching plaintiff's arm; and attempting to look down dress), and <u>Hopkins v. Baltimore Gas and Elec. Co.</u>, 77 F.3d 745, 753 (4th Cir. 1996) (alleged harasser "bumped into [plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom"). In <u>Shepherd</u>, unlike this case, the alleged harasser was a co-worker, and not a supervisor, and thus the plaintiff likely experienced the conduct as less severe because she did not have to worry about complaining about a superior. <u>Hopkins</u> was a pre-<u>Oncale</u> decision that was likely colored by the fact that the harassment was same-sex, male on male. The court found that much of the alleged conduct was "sexually neutral or, at most, ambiguous." <u>Hopkins</u>, 77 F.3d at 753. Again, the court in this case purports to assume that the conduct alleged by Mendoza "is sexual in nature." <u>Ante</u> at 21.

In sum, the majority lacks case support for its proposition that conduct like that alleged by Mendoza has been found insufficient "as a matter of law" to meet the <u>Harris</u> requirements of sufficient severity or pervasiveness. <u>Ante</u> at 29.

62

contextually specific, however, Mendoza's allegations certainly meet the threshold

of what is required for the case to reach a jury.  See Sparks v. Pilot Freight

Carriers, Inc., 830 F.2d 1554, 1561, n.13 (11th Cir. 1987) ("With access to all the

evidence, and with the common sense to make credibility determinations, a

factfinder should not find it difficult to distinguish between harassing actions that

constitute a violation of Title VII and those 'ambiguous' actions which simply may

not 'create an abusive working environment.' ").

Other circuits have found conduct that is less egregious than that alleged by

Mendoza to be sufficiently severe or pervasive to survive a motion for judgment as

a matter of law.  See, e.g., Rorie v. United Parcel Serv., Inc., 151 F.3d 757, 761-62

(8th Cir. 1998) (plaintiff's allegations that manager patted her on the back, brushed

up against her, and told her that she smelled good sufficient to survive a motion for

summary judgment);[10] Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408,

---

[10] The majority's reading of Rorie seems slightly misleading.  In note 10 of the court's
opinion, the majority claims that "when all the alleged conduct in [the decision] is accurately listed,
[the decision], if anything, highlight[s] the insufficiency of Mendoza's evidence." The only conduct
at issue in Rorie is the conduct I list in the text of my opinion: the plaintiff alleged that her manager
patted her on the back, brushed up against her, and told her that she smelled good.  In note 10 of the
court's opinion, the majority attempts to "reveal" the "actual" facts at issue in Rorie when it suggests
that, in addition to the facts I list, the court also relied heavily on findings that the manager placed
a "telephone call to plaintiff's home -- asking her to go swimming and if she 'had heard rumors
about a co-worker's penis' and stat[ed] that she 'looked better in the UPS uniform than other
women.'"  Ante at 29-30, n. 10.  The court in Rorie, however, did not rely on these "additional"
allegations to support its conclusion that plaintiff's allegations of the manager patting her on the
back, brushing up against her, and telling her that she smelled good were enough to present a jury
question as to hostile environment.  The court specifically found that the "additional" allegations

63

1412-15 (10th Cir. 1997) (allegation of six sexually disparaging remarks sufficient to survive motion for judgment as a matter of law). Today's opinion appears to require a plaintiff to make a showing that is beyond that required by any other circuit. I say this because the only cases cited approvingly by the majority involved conduct so outrageous that it would shock the conscience of the court:

---

that the majority cites today fell outside of the 180 day period within which the plaintiff filed her compliant with the EEOC, and thus could not be considered by the court in any way other than to "provide relevant background to later discriminatory acts." Rorie, 151 F.3d at 761. The Rorie court wrote:

> UPS argues that the only allegations falling within the 180-day period are McFadden's comments about Rorie smelling good, patting her on the back, and brushing up against her. UPS contends that these actions are insufficient to support a hostile environment claim because McFadden was seldom in [the place where Rorie worked] . . . . UPS also contends that Rorie failed to complain of McFadden's conduct. We disagree.
>
> In September 1995, McFadden telephoned Rorie at home. During their conversation, McFadden asked Rorie if she would like to go swimming and whether she had heard the rumors about a co-worker's penis size. She declined the swimming invitation. During the same conversation, Rorie complained to McFadden about a female co-worker's attitude toward her. McFadden told her it was because Rorie looked better in the UPS uniform than the other woman . . . .
>
> While we concede that the facts of this case are on the borderline of those sufficient to support a claim of sexual harassment, <u>we cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her she smells good does not constitute sexual harassment as a matter of law. Recognizing that the September 1995 conversation falls outside of the 180-day period</u>, we believe that, at the very least, McFadden's comments suggest that <u>his later behavior</u> presents a jury question as to hostile environment.

Rorie, 151 F.3d at 761-62 (emphasis added). The proposition for which I cite the case, therefore, remains undisputed. The Eighth Circuit has found that a plaintiff who alleged that her manager patted her on the back, brushed up against her, and told her that she smelled good had alleged conduct severe or pervasive enough to create a jury question as to hostile environment. Mendoza's allegations unquestionably go beyond the conduct at issue in Rorie. Therefore, other circuits have found conduct that is less egregious than that alleged by Mendoza to be sufficiently severe or pervasive to survive a motion for judgment as a matter of law.

female employees being held down bodily so that other employees could fondle their breasts and legs, Hall v. Gus Constr. Co., 842 F.2d 1010, 1012 (8th Cir. 1988); physical and verbal abuse that took place on a daily basis, Dees v. Johnson Controls World Servs, Inc., 168 F.3d 417, 418-19 (11th Cir. 1999); and the grabbing of plaintiffs' bodies, commenting extensively on their physical attributes, showing them pornographic photos and videotapes, offering them money for sex, and speculating on plaintiffs' sexual prowess, Splunge v. Shoney's, Inc., 97 F.3d 488, 489 (11th Cir. 1996). Those cases certainly presented hostile working environments, but as a matter of precedent we are far beyond the day when a woman must allege multiple rapes before she can make out a case of sexual harassment. See Vinson, 477 U.S. at 60, 106 S. Ct. at 2402 (harassment included forcible rape on several occasions). As the Court made clear in Harris,

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

Harris, 510 U.S. at 22, 114 S. Ct. at 370-71.

We do not transform Title VII into a workplace "civility code," Oncale, 118 S. Ct. at 1002, when we condemn conduct less severe than that which shocks our conscience. And when we raise the bar as high as the majority does today, it becomes more likely that we will miss the more subtle forms of sex discrimination that may still infest the workplace, and make it more difficult for women, especially, to participate on terms of equality with their male counterparts.[11] The sexist remark, the offensive touch, the repeated request for an intimate outing: all of these may seem merely annoying and relatively harmless in isolation from one another. But add them up; see them in context; and then try to imagine what it must be like for an employee who merely wants to come to work and make a living to have to endure a daily barrage of sexual assault. Then we might begin to

---

[11] We also become more vulnerable to the charge that in deciding whether the "reasonable person" would find alleged instances of workplace harassment to be sufficiently severe or pervasive to alter the conditions of employment, we are in fact adopting the perspective of the "reasonable harasser," and systematically excluding the experiences of the victims of sexual harassment. See Kathryn Abrams, "Gender Discrimination and the Transformation of Workplace Norms," 42 Vand. L. Rev. 1183, 1203 (1989); Susan Estrich, "Sex at Work," 43 Stan. L. Rev. 813, 820 (1991); see also, Ellison v. Brady, 924 F.2d 872, 879 (9th Cir. 1991) ("a sex-blind reasonable person standard tends to be male-biased and tends to systematically ignore the experiences of women"); Rabidue v. Osceola Refining Co., 805 F.2d 611, 626 (6th Cir. 1986) ("[U]nless the outlook of the reasonable woman is adopted, the defendants as well as the courts are permitted to sustain ingrained notions of reasonable behavior fashioned by the offenders.") (Keith, J., concurring in part and dissenting in part). This case is a perfect example. Mendoza is certainly not a woman of Victorian sensibilities who was uninitiated in the often boorish ways of working-class employment. Before going to Borden she worked for years as a cocktail waitress, a job that one imagines could not be staffed with those who possess the most delicate of constitutions. If Mendoza found her harassment at Borden to be severe and pervasive, then it is likely that our objective reasonable person, who has probably never had to serve drinks to a gaggle of besotted, leering males, would feel similarly.

66

understand the power that these "little" sexual offenses, when considered collectively, can have in reproducing a workplace in which women, especially, are often still thought of by their male employers as incompetents and playthings.

Of course not all sexually offensive conduct in the workplace rises to the level of a Title VII violation. See Harris, 510 U.S. at 21, 114 S. Ct. at 370 (excluding from Title VII's coverage "conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment"). The conduct alleged in this case, however, goes far beyond " 'simple teasing,' offhand comments, and isolated incidents." Faragher, 118 S. Ct. at 2283 (citations omitted). According to Red Mendoza, her direct supervisor made a daily game out of following and staring at her in a sexually offensive and humiliating manner. He touched her, made sexual comments to her, and sniffed in the direction of her groin in a way that goes beyond the boorish to the patently offensive. This is not just "uncivil." It may be illegal. At the very least, Mendoza ought to be allowed to present her claim to a jury.

V.

Today's decision represents a major departure from established sexual harassment law. Out of nowhere, the court has decided that evidence of stalking and leering by a harasser should be given short shrift when used by a plaintiff to

support a claim for hostile environment sexual harassment. Moreover, the court's whole method of analysis is unfaithful to a body of precedent directing us to review the plaintiff's allegations cumulatively.[12] I sympathize with what the majority is trying to do today – to "police the baseline for hostile environment claims," Ante at 10 (citation omitted), thus enabling district courts to weed out frivolous claims that burden the federal docket. This, however, is not the way to do it. It is Congress that enacted Title VII. When we ignore the congressional mandate, as interpreted by the Supreme Court, we become most vulnerable to the charge that we, as members of the unelected federal judiciary, are usurping the legislative prerogative. It may be the case, as Justice Scalia has observed, that "[a]s a practical matter, [the Court's holding in Harris] lets virtually unguided juries decide whether sex-related conduct engaged in (or permitted by) an employer is egregious enough to warrant an award of damages." Harris, 510 U.S.

---

[12] The degree of departure from established precedent is made even more manifest when one observes that this case was not worthy of en banc review in the first place. Under Eleventh Circuit Rule 35-3, en banc consideration "is an extraordinary procedure intended to bring to the attention of the entire court a precedent-setting error of exceptional importance . . . [or] a panel opinion that is allegedly in direct conflict with precedent of the Supreme Court or of this circuit." See also, Fed. R. App. P. 35(a). There was certainly nothing "extraordinary" or "precedent-setting" about the panel opinion in this case. It was a rather routine decision that rested on an extremely fact-intensive review. One senses that the court is reaching to draw a line in the sand in hostile environment sexual harassment cases, but it was certainly a mistake for the majority to seize upon this case. There is nothing extraordinary about finding that allegations of pervasive harassment over a four month period are sufficient to make out a claim under Title VII, and so it appears that it is the court's en banc decision today, and not the panel opinion, that is "in direct conflict with precedent of the Supreme Court [and] of this circuit."

68

at 24, 114 S. Ct. at 372 (Scalia, J., concurring). If this is a problem, however, the solution lies with Congress and not the Third Branch.

Accordingly, I would vacate the judgment dismissing Mendoza's Title VII sexual harassment claim, and remand that claim to the district court for a new trial.

BARKETT, Circuit Judge, concurring in part, and dissenting in part, in which BIRCH, Circuit Judge, joins:

I concur with the judgment of the court but for the affirmance of the directed verdict on the sexual harassment claim. To affirm the directed verdict on the sexual harassment claim in this case, the majority must conclude, after "review[ing] all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party," that no genuine issue of material fact exists and no "reasonable and fair-minded persons . . . might reach different conclusions" as to whether Red Mendoza suffered sexual harassment. A directed verdict is only proper where "[t]he facts and inferences . . . 'so overwhelmingly favor the verdict' that no reasonable juror could reach a contrary decision." Bivens Garden Office Bldg., Inc. v. Barnett Banks of Florida, Inc., 140 F.3d 898, 905 (11th Cir. 1998) (quoting Hibiscus Assoc. v. Board of Trustees, 50 F.3d 908, 920 (11th Cir. 1995)). Under this standard, the directed verdict in this case cannot be affirmed. This record in conjunction with the directives of the Supreme Court leads, instead, to the conclusion that the question presented here is one only for the jury.

The method by which the majority reaches its desired conclusion that the alleged conduct fails to present a jury question is flawed in several respects. First, that conclusion depends on an account of the alleged conduct that is inconsistent

70

with the record.  Second, to achieve that account, the majority disregards the law requiring that all incidents be considered as a whole and disaggregates the conduct at issue.  Taking each alleged incident separately, the majority credits only one of the several possible inferences which could be drawn from the conduct described, and deliberately excludes from consideration major components of Mendoza's harassment claim, inferring that being followed or stared at in the workplace can not under any circumstances contribute to a sexually harassing hostile environment. Thus, by selectively considering the facts and choosing the inferences to be drawn from them, the majority usurps the quintessential jury function. Third, throughout this process the majority misapprehends and misstates the law of sexual harassment.  Because reasonable people could differ as to the inferences to be drawn from the facts in evidence, and because the majority errs in explicating and applying the law,  I dissent from the affirmance of the directed verdict on Mendoza's sexual harassment claim.

## I. THE TESTIMONY IN THIS CASE

The crux of this case is whether the conduct conveyed by Mendoza's testimony in its totality *could* be deemed by a reasonable jury to be objectively either (a) severe, *or* (b) pervasive enough to alter the conditions of her employment sufficient to create an abusive work environment.  There is no question that the

71

issue here relates not to severity but to acts which, because of their alleged

frequency and connection to other acts sexual in nature, could be deemed pervasive

enough to constitute a hostile environment.  The standard for whether such an

environment exists has been expressly defined – in quintessential jury terms – as

an environment that a *reasonable person* would find hostile or abusive.  Instead of

viewing the evidence tending to disprove the claim, the Supreme Court has told us

that, "in passing upon whether there is sufficient evidence to submit an issue to the

jury we need look only to the evidence and reasonable inferences which tend to

support the case."  Wilkerson v. McCarthy, 336 U.S. 53, 57 (1949).  As Judge

Arnold of the Eighth Circuit paraphrased this standard:

> In other words, when a motion for directed verdict or for judgment not withstanding the verdict is made, the court must assume that all of the evidence supporting the party opposing the motion is true, and must, in addition, give that party the benefit of all reasonable inferences drawn from that evidence.  The case may be taken from the jury only if no rational jury could find against the moving party on the evidence so viewed.  Probably this formulation will result in fewer grants of motions for directed verdict than would result if judges were free to take cases from the jury because of what they view as very strong evidence supporting the moving party.  Occasionally verdicts may be returned with which judges strongly disagree.  This is a price, we think, worth paying for the jury system, which is enshrined in the Bill of Rights and sanctified by centuries of history.

Dace v. ACF Indus., Inc., 722 F.2d 374, 376-77 (8th Cir. 1993) (footnote omitted).
Mendoza's testimony, viewed in the light most favorable to her and with all

reasonable inferences drawn in her favor, was that on a daily basis, she had to work

72

in an atmosphere where the plant's highest ranking executive was always after her.

In 79 pages of transcript, Mendoza detailed the conduct of her supervisor throughout the year during which Page was her supervisor. In summary, she asserted that he (i) constantly followed her; (ii) continuously stared at her in a sexual manner, looking her body up and down; (iii) on two occasions, sniffed at her groin area; (iv) on one occasion just sniffed at her; (v) rubbed up against her; and (vi) made inappropriate comments which were sexual in nature. Specifically, Mendoza, testified that:

> From the time Mr. Page came to the Miami plant, he *always* seemed to be wherever I was. If I was in the lunch room, he was there. If I was at a picnic table outside on a break, he was there. The man was *constantly* watching me and following me around and looking me up and down, whether it was face to face with me or as I would get up from a lunch table or from the picnic table to walk away and back to the office . . . . He seemed to be *wherever I was* in the plant. He followed me not around the office, but around the hallways in the plant. Okay? He was at a lunch table in the lunch room. He would be at a picnic table outside. And he would look me up and down, very, in a very obvious fashion. When I was face to face with him, when I would get up and walk away from these tables and areas, I could feel him watching me up and down . . . . This was a *constant* thing.

(Tr. Trn. at 24-27) (emphasis added). On cross examination, Mendoza was asked if the incidents of following were constant, or something which took place only two to four times. She replied:

73

[N]o, that was a *constant* thing from the time he walked into the plant
. . . . It was a *constant* thing.

(Tr. Trn. at 71) (emphasis added).

In addition to the staring and following, Mendoza described Page's actions in staring and sniffing at her groin area. She testified that while at the copy machine,

> I felt somebody watching me. I looked directly to my right. He was sitting at a chair in the conference room, which is approximately 20, 25 feet away from me, at a chair at the end of the table. And he looked at me up and down, and stopped in my groin area and made a (indicating) sniffing motion.

(Tr. Trn. at 27). Mendoza testified that another time, when in Page's office seeking permission to leave work because of the flu,

> [He] turned around to his right, looked directly at me, up and down, and stopped again in the groin area, made a sniffing motion again, (indicating), like that.

(Tr. Trn. at 27). He then rejected her request and when asked if she recalled the expression on his face, Mendoza said, "He was intense . . . . He was staring at me . . . ." (Tr. Trn. at 27).

The majority suggests that the sniffing was not necessarily sexually motivated or, as the majority puts it, "gender related" but could have been totally

74

innocent conduct.[1]  Indeed, it may have been innocent, and the jury may well have agreed with the majority's view.  However, the jury was equally entitled to believe Mendoza's perception that it was sexually motivated, and directed at her in order to intimidate and harass:

> It was obvious to me . . . .  The man would look me up and down, stop in my groin area.  He was looking right at me, directly at me.  It was obvious to me, it was at me.  This happened twice, stopped in the groin area and (indicating) made the sniffing.

(Tr. Trn. at 34-35).  She further testified to Page's comment on another occasion which she found offensive and consistent with the sniffing incidents, "You're just like me, always sniffing around."  (Tr. Trn. at 75).  When asked whether it could have been an innocent comment, she said that she "most certainly" thought it a sexual comment.  "I have never heard a complete[ly] innocent comment like that," she testified.  (Tr. Trn. at 75).

After describing the incident in which Page rubbed his hip against her, Mendoza testified that, "I was startled.  I looked over and he had a smile on his face, right, had a smile on his face, like he was enjoying himself."  (Tr. Trn. at 73).

---

[1] Of course, the majority is unable to evaluate what Mendoza described through her actions before the jury as there is no videotape of the trial testimony.  An appellate court is unable to observe the witnesses' body language, the tone of the witnesses' testimony, and the manner in which the testimony was given.  The transcript says only "indicating" as to the sniffing motion.  The jury is the only fact finding body with knowledge of Mendoza's testimony about Page's expression, demeanor, and what her gesture indicated – an exaggerated lewd sniffing, a mere allergy-induced sniffle, or something else.

When asked if she had never put her hands on someone's shoulders when passing them to prevent them from being startled, Mendoza responded, "I may have, but not rubbed my hips up against people." (Tr. Trn. at 73).

Mendoza testified that Page was "coming on to me, flirting with me." (Tr. Trn. at 29). "I went into his office angry and disgusted at this . . . . Mr. Page turned around and I said to him, 'I came in here to work, period.' And his reply to me was, 'yeah, I'm getting fired up, too.'" (Tr. Trn. at 29). When asked whether Page's comment – "I'm getting fired up, too" – was necessarily sexual in nature, she said, "I took those words to be his response to what I was saying to him. And he knew what I was talking about." (Tr. Trn. at 69). Similarly, she testified that the way he smiled at her, "along with other things," was inappropriate, (Tr. Trn. at 69), and that when she "put it all together, I realized what was going on . . . . He was, his advances to me were definitely sexual in nature." (Tr. Trn. at 68).

Crediting Mendoza's account of the frequency and intensity of Page's unrelenting stares and looks, together with her allegations of his more egregious sexual conduct, such as overtly sniffing and looking at her groin area, it simply cannot be said that, "no reasonable and fair-minded persons . . . might reach different conclusions" as to whether Red Mendoza suffered sexual harassment. Of course, it is possible that a reasonable person might conclude, based on the totality

76

of the evidence, that Mendoza's workplace environment was neither hostile nor abusive. The jury may not have believed that the incidents occurred. The jury may have believed the alleged incidents occurred, but they may have drawn different inferences from them. Or the jury may have determined that a reasonable person would not have found the environment to be hostile. The point is that it was within the jury's province to decide and not within an appellate court's. This record cannot support a conclusion that "[t]he facts and inferences . . . 'so overwhelmingly favor the verdict' that no reasonable juror could reach a contrary decision." Bivens Garden, 140 F.3d at 905 (quoting Hibiscus Assoc., 50 F.3d at 920).

## II. THE TESTIMONY MUST BE VIEWED IN ITS TOTALITY, AND NOT DISAGGREGATED INTO SEPARATE ACTS.

As noted, an objectively hostile sexual environment is "an environment that a *reasonable person* would find hostile or abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (emphasis added). Under the law, that means, as common sense would likewise tell us, that when deciding whether the conduct at issue is pervasive enough to constitute a sexually harassing "hostile environment," it is the "environment" created by disparate acts which must be examined. Or, put another way, the incidents alleged must be viewed in the context of the environment they

create and cannot be viewed and analyzed as separate and discrete claims based on

separate and discrete incidents:

> [T]he analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes. "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario." It follows naturally from this proposition that the environment viewed as a whole may satisfy the legal definition of an abusive working environment although no single episode crosses the Title VII threshold.

Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1524 (M.D. Fla.

1991) (quoting Andrews v. City of Philadelphia et al., 895 F.2d 1469, 1484 (3rd

Cir. 1990)).

This Court validated this approach in holding that "[a] hostile environment

claim is a single cause of action rather than a sum total of a number of mutually

distinct causes of action to be judged each on its own merits," making it improper

to "examine each alleged incident of harassment in a vacuum." Vance v. Southern

Bell Tel. & Tel. Co., 863 F.2d 1503, 1510-11 (11th Cir. 1989) (holding that the

district court erred in requiring plaintiff to establish a claim as to each allegation of

harassment); see Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1109 (9th Cir.

78

1998) ("Discriminatory behavior comes in all shapes and sizes, and what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender.").

The Supreme Court expressed the same principle in Harris, 510 U.S. at 23, saying that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."  Most recently, it was amplified by Justice Scalia writing for a unanimous court in Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1003 (1998):

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.  Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

Although the majority acknowledges the Supreme Court's admonition that courts must look to the "totality of the circumstances," it repeatedly fails to adhere to the legal requirement that it is the context in its totality and not each incident in isolation that courts are required to examine when considering Title VII claims. To reduce the impact of the evidence in support of Mendoza's hostile environment

79

claim, the majority first separately considers Mendoza's testimony that she was constantly followed and then simply eliminates consideration of that testimony.

The majority suggests that following and staring are behaviors categorically exempt from the reach of Title VII because they are ambiguous in meaning, and somehow would create a lower "baseline" for sexual harassment claims. The majority then concludes that, *"aside from Page's 'constant' following and staring,* the conduct asserted by Mendoza was not frequent," and that "frequency of the harassing conduct – is also for the most part lacking." (Maj. Op. at 21-23 (emphasis added)).

There is no question that being followed may not be actionable. On the other hand, it may very well constitute a violation of Title VII. Such a determination must depend on the circumstances. The act of walking behind someone cannot be determined by itself to be either bad or good, malicious or benign, actionable or not. The circumstances necessarily dictate how it must be characterized. Can it be characterized as simply two people walking serially toward the same destination? Can it be characterized, as the majority suggests, simply as an employer "keeping an eye" on an employee? Or can it be

characterized as stalking?[2]  The various possibilities illustrate the necessity of examining allegations of being followed in the context of other incidents alleged. The claim here is *not* one based on simply being followed.  From Mendoza's testimony, were it to be credited, it is a claim of being "constantly" followed – which in any lexicon can only mean all the time and, certainly, frequently – by someone who had sniffed at her groin area, leered at her by looking her "up and down," made innuendos ("I'm getting fired up"), and, when the opportunity arose, rubbed his hip against hers.

The characterization of Mendoza's claim as one based on the "everyday observation of fellow employees" and as "a natural and unavoidable occurrence" arising out of "people work[ing] together in close quarters," is one way of viewing the evidence.  (Maj. Op. at 20).  As the majority points out, another credible interpretation is that following or staring "can betray romantic or sexual attraction."  (Maj. Op. at 20).  Perhaps Mendoza's supervisor was indeed only "keep[ing] an eye on" her. (Maj. Op. at 20).  An equally reasonable but unmentioned possible interpretation, however, is that the staring and following

---

[2]Indeed, Mendoza's allegations could constitute the crime of stalking as it is defined in most jurisdictions.  For example, Florida's statute criminalizes any repeated following, whether or not accompanied by a threat:  "Any person who willfully, maliciously, and repeatedly follows or harasses another person commits the offense of stalking, a misdemeanor of the first degree . . . ." Fla. Stat. § 784.048(3) (West 1992).

were intended to harass, humiliate, or intimidate. The majority errs in crediting any one interpretation over the others, and does so, among other reasons, because it fails to view the staring and following in the context of the surrounding testimony. In making its choice of inferences from selected facts, the majority fails to "look only to the evidence and reasonable inferences which tend to support the case of a litigant . . . ." Wilkerson, 336 U.S. at 57.

## III. REQUIREMENTS OF A SEXUAL HARASSMENT CLAIM

In addition to failing to view the facts as a whole, the majority compounds its mistakes by misstating and misapplying the law of sexual harassment.

### A. The Purposes of Title VII

The Supreme Court has repeatedly recognized that the purpose of Title VII is to strike at the disparate treatment of men and women in employment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986). Employees of either gender may experience discrimination or harassment in a variety of different forms, one of which is unwelcome sexual advances.[3]

---

[3] As Justice Scalia wrote for a unanimous court in Oncale:

[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The Court in Meritor stated that this language was "not limited to 'economic' or 'tangible' discrimination," but that it "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." 477 U.S. at 64 (quoting Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)). The Court went on to say that Title VII is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris, 510 U.S. at 21 (quoting Meritor, 477 U.S. at 65, 67). As Justice Ginsburg noted in her concurring opinion in Harris:

> The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.

Harris, 510 U.S. at 25; see also Andrews, 895 F.2d at 1485 ("[T]he offensive conduct is not necessarily required to include sexual overtones in every instance.");

118 S.Ct. at 1002.

83

Lipsett v. University of Puerto Rico, 864 F.2d 881, 905 (1st Cir. 1988) ("[verbal attack,] although not explicitly sexual, was nonetheless charged with anti-female animus, and therefore could be found to have contributed significantly to the hostile environment"); Hall v. Gus Constr. Co., 842 F.2d 1010, 1014 (8th Cir. 1988) ("Intimidation and hostility toward women because they are women can obviously result from conduct other than sexual advances."); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) (rejecting narrow definition of sexual harassment that requires predicate acts to be clearly sexual in nature); McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985) ("We have never held that sexual harassment or other unequal treatment of an employee or group of employees that occurs because of the sex of the employee must, to be illegal under Title VII, take the form of sexual advances or of other incidents with clearly sexual overtones. And we decline to do so now."); Vicki Schultz, Reconceptualizing Sexual Harassment, 107 Yale L.J. 1683, 1769-74 (1998).

The correct question in a sexual harassment case is whether the conduct, sexual or not, ridicules women, treats them as inferior, or is intended to humiliate or intimidate them such that they are subjected to unequal treatment in the workplace. The Supreme Court has stated that the answer to this question is not, "and by its nature cannot be," subject to "a mathematically precise test." Harris,

84

510 U.S. at 22.  The majority ignores the question and relies exclusively on a list of four factors which, in fact, were included by Justice O'Connor in Harris as a non-exhaustive list:

> But we can say that whether an environment is "hostile" or "abusive" *can be determined only by looking at all the circumstances*.  These *may* include the frequency of the discriminatory conduct; its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while psychological harm, like any other relevant factor, may be taken into account, *no single factor is required.*

Id. at 23 (emphasis added).

Assuming there are reasonable people who, while crediting Mendoza's version of the facts, would not think that staring at a woman's groin area while making sexually suggestive sniffing noises is degrading, humiliating, and/or intimidating, it seems beyond peradventure that many reasonable people would indeed find it to be so.

**B. Mendoza Sufficiently Alleged Impairment To Her Job Performance**

In addition, the majority errs in contending that Mendoza's claim must fail because she has not demonstrated any impairment of her job performance.  As Justice Ginsberg noted in Harris:

> To show such interference [with an employee's work performance], "the plaintiff need not prove that his or her tangible productivity has

declined as a result of the harassment." It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to "ma[k]e it more difficult to do the job." Davis concerned race-based discrimination, but that difference does not alter the analysis . . . .

510 U.S. at 25 (quoting Davis v. Monsanto Chemical Co., 858 F.2d 345, 349 (6th Cir. 1988)). Title VII "comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."

Id. at 22. In response to Page's treatment, Mendoza complained to him: "I came in here to work, period" (Tr. Trn. at 29), and relayed her state of mind as a result of Page's conduct: "I was embarrassed, I was humiliated, I felt degraded." (Tr. Trn. at 35).

If credited by a jury, the totality of Page's conduct can create an inference that her gender was the motivating impulse for his behavior and strikes at the core of Mendoza's entitlement to a workplace free of discriminatory animus. In rejecting an assertion that the consequences of a hostile environment must be so severe as to affect one's psychological health, the Supreme Court stated:

86

[T]he District Court erred in relying on whether the conduct "seriously affect[ed] plaintiff's psychological well-being" or led her to "suffe[r] injury." Such an inquiry may needlessly focus the factfinder's attention on concrete psychological harm, an element Title VII does not require. Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious.

Harris, 510 U.S. at 22 (internal citation omitted). Based on these Supreme Court pronouncements, Mendoza has presented sufficient evidence for a jury to consider her claim under Title VII.

**C. The Majority "Polices the Baseline" in Contravention of Congress' Direction**

At the heart of the majority's opinion is the view that the incidents endured by Mendoza simply weren't that bad, that she should just put up with them rather than bring a Title VII claim. The majority contends that directing a verdict for the defendant in this case will promote its goal of "polic[ing] the baseline for hostile environment claims." (Maj. Op. at 10). In support of the majority's project, the majority cites a number of cases which it claims "delineate a minimum level of severity or pervasiveness" necessary for Title VII violations. (Maj. Op. at 15). In so doing, the majority attempts to compare various lists of allegedly harassing conduct with that alleged by Mendoza.

87

Again, such an analysis ignores our duty to consider the incidents not in isolation or as a laundry list, but in context and in light of the testimony as a whole. To rely on a string cite of cases – several of which reached rather dubious results – is a serious mistake because the majority continues to eliminate context as a criterion. Each of these cases must be taken on the totality of their unique facts. These cases, when viewed in conjunction with the many other cases where the "bar" is as low or lower,[4] underscore that this is a matter for juries and not judges to decide as a mater of law.

The majority offers no substantiation for the claim – which underlies its argument – that juries will be unable to distinguish sexually threatening staring and

---

[4]See Williams v. General Motors, __ F.3d __ (6th Cir. Aug. 5, 1999) (overturning the district court's dismissal of plaintiff's complaints of foul language, mean and annoying treatment by co-workers, sexually related remarks, on grounds that "the district court disaggregated the plaintiff's claims . . . which robbed the incidents of their cumulative effect"); Rorie v. UPS, Inc., 151 F.3d 757, 762 (8th Cir. 1998) (finding case "borderline" but holding allegations that supervisor "pat[ted] female employee on the back, brush[ed] up against her, and told her she smells good" constituted actionable sexual harassment); Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998) (sexual innuendos and brushing up against co-employees constituted actionable harassment); Gallagher v. Delaney, 139 F.3d 338, 347 (2d Cir. 1998) ("Evaluation of ambiguous acts such as . . .[giving a female employee a teddy bear, directing her to go to lunch with him, inviting her to go to Atlantic City with him] in this case presents an issue for the jury."); Sandra Barna v. City of Cleveland, 172 F.3d 47 (6th Cir. Dec. 22, 1998) (affirming the district court's denial of a directed verdict motion because the "jury was free to conclude" that plaintiff was telling the truth regarding harassment including a constant stream of sexual comments, requests, and advances occurring on a daily basis); Carrero v. New York City Hous. Auth., 890 F.2d 569, 578 (2d Cir. 1989) ("emphatically" rejecting defendant's argument that "[harasser's] conduct, though not a paradigm of modern inter-gender workplace relations, was not pervasive enough to trigger relief, . . . and federal law does not punish 'trivial behavior' consisting of only 'two kisses, three arm strokes,' several degrading epithets and other objectionable – but ultimately harmless – conduct").

following from "innocent looking" or merely crossing paths with a coworker. The Supreme Court does not appear to entertain the same doubts. Justice Scalia explained in <u>Oncale</u> that the requirement that allegedly harassing behavior must create "an environment that a reasonable person would find hostile or abusive" is "sufficient to ensure that courts *and juries* do not mistake ordinary socializing in the workplace . . . for discriminatory 'conditions of employment.'" <u>Oncale</u>, 118 S. Ct. at 1003 (emphasis added) (internal quotation marks omitted).

This case comes to us for review of the district court's grant of a Rule 50 motion for judgment as a matter of law. "A motion for a directed verdict, or for a judgment notwithstanding the verdict under Rule of Civil Procedure 50, 28 U.S.C.A., raises a question of law only: Whether there is *any evidence* which, *if believed*, would authorize a verdict against movant. The trial judge in considering those motions does not exercise discretion, but makes a ruling of law . . . ." <u>Marsh v. Illinois Cent. R. Co.</u>, 175 F.2d 498, 500 (5th Cir. 1949)[5] (emphasis added). In contravention of this clearly articulated judicial role, the majority repeatedly engages in its own assessments of the credibility and value of Mendoza's testimony. For instance, the majority concludes that Page's statement that he was

---

[5] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

"getting fired up" had no "sexual or other gender-related connotation." (Maj. Op. at 20). Moreover, the majority concludes that none of the conduct of which Mendoza complained was humiliating (Maj. Op. at 21) – in direct contradiction to her sworn statement that she in fact felt "humiliated" (Tr. Trn. at 35). Further, the majority dismisses Mendoza's allegations that Page harassed her by constantly following her and staring at her, preferring instead to infer that Page "simply showed up when Mendoza happened to be in the hallways, in the lunch room, or at the picnic table outside." (Maj. Op. at 24). These explicit credibility determinations and factual interpretations are clearly far outside this Court's appropriate role at this stage of Mendoza's litigation. Indeed, it is our duty "to review all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of" Mendoza. Bivens, 140 F.3d at 905. By making these determinations and drawing these inferences, the majority has usurped the traditional role of the rightful finder of fact.

In the Civil Rights Act of 1991, Congress specifically amended Title VII. Having from its inception in 1964 charged the court with the task of deciding whether actions alleged by discrimination plaintiffs constituted a violation of Title VII, Congress changed its mind in 1991 and specifically provided all plaintiffs seeking compensatory or punitive damages with the right to have his or her case

90

heard before a jury. 42 U.S.C. § 1981a(c)(1). The mistrust of juries evidenced by the majority is at odds with the specific directive of Congress that the jury is to decide whether gender discrimination has occurred in the workplace. In concluding that plaintiffs seeking compensatory and punitive damages should have the right to seek a jury determination of their claims, Congress reasoned that "[t]he jury system is the cornerstone of our system of civil justice, as evidenced by the Seventh Amendment's guarantee. Just as they have for hundreds of years, juries are fully capable of determining whether an award of damages is appropriate and if so, how large it must be to compensate the plaintiff adequately and to deter future repetition of the prohibited conduct." H.R. Rep. No. 102-40(I), 72 (1991) (footnote omitted), reprinted in 1991 U.S.C.C.A.N. 549, 610.[6]

Civil juries traditionally have been charged with the task of deciding all questions of fact where reasonable people might credit different versions of the facts presented, thereby differing as to the proper resolution of the ultimate question in the case. As in other contexts wherein the jury is charged with applying a "reasonable man" standard, allowing jurors to decide the question of

---

[6] The legislative history of the Civil Rights Act of 1991 is extremely limited. Most of the discussion that led to the compromise statute took place in closed door discussions between the Bush White House and Congressional leaders. See Douglas C. Herbert & Lani Schweiker Shelton, A Pragmatic Argument Against Applying the Disparate Impact Doctrine in Age Discrimination Cases, 37 S. Tex. L. Rev. 625, 652 n.147 (1996).

reasonableness as to Title VII issues is precisely what Congress intended. Cf. Smith v. United States, 431 U.S. 291, 302 (1977) ("It would be just as inappropriate for a legislature to attempt to freeze a jury to one definition of reasonableness as it would be for a legislature to try to define the contemporary community standard of appeal to prurient interest or patent offensiveness. . . ."); id. ("A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes. . . .") (internal quotation marks omitted).

Because I believe the majority has not only misinterpreted but misstated the law of sexual harassment and has arrogated to itself the jury function in violation of our legal precedent and Title VII's specific entitlement to a jury's verdict, I dissent.